Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Duncan joined. Judge Shedd wrote a ■ dissenting opinion. AGEE, Circuit Judge: Deputies Michael Price and Keith Beasley (collectively, the “Deputies”)—both employed by the Haywood County, North Carolina, Sheriffs Department—shot and killed David Hensley outside his home on the morning of August 9, 2012. The plaintiffs—Hensley’s widow and two daughters—brought suit against the Deputies in both their individual and official capacities under 42 U.S.C. § 1983 and North Carolina law in the United States District Court, for the Western District of North Carolina. The Deputies asserted federal qualified immunity and related state defenses in a motion for summary judgment, which the district court denied. For the reasons that follow, we affirm the district court’s judgment.[1] I. A. On an interlocutory appeal raising the issue of qualified immunity, the Court views the facts in the light most favorable to the plaintiffs. Pegg v. Herrnberger, 845 F.3d 112, 117 (4th Cir. 2017). We summarize the facts viewed in that light as follows, recognizing the Deputies’ forecast of evidence is markedly to the contrary. In August 2012, the Deputies[2] responded to a domestic disturbance call at Hensley’s home around 6:15 a.m. When the pair arrived, they parked their cars in the front yard and remained in the vehicles facing the home’s porch. Shortly thereafter, Hensley; his older daughter, Rachelle Ferguson; and his minor daughter, H.H., walked out of the home and onto the porch together. Hensley held a handgun. The Deputies' noticed the handgun, but took no action—-they neither announced their presence nor asked Hensley to drop the gun. Instead, they watched as Hensley briefly struggled with both Ferguson and HS, striking'Ferguson with the handgun. After that altercation ended, the Deputies watched as Hensley walked off the porch and into the yard toward them. When he reached the yard, Hensley looked back at his daughters on the porch. According to plaintiffs’ pleadings and proffer of evidence, Hensley still held the handgun with it's muzzle pointed at the ground as he descended the" porch stairs and walked toward the Deputies. Throughout this series of events, Hensley and the Deputies did not acknowledge each other’s presence. Hensley never raised the gun toward the Deputies or made any overt threats toward them. For their part, the Deputies never ordered him to stop, to drop the gun or issued any type of warning. The Deputies concede that neither of them ever spoke to Hensley. Shortly .after Hensley descended the porch and walked into the yard, the Deputies exited their vehicles and shot and killed him. B, In July 2014, the plaintiffs—Teresa Ann Hensley (Hensley’s wife), in her capacity as administrator of Hensley’s estate; Ferguson; and H.H.—filed suit against the Deputies in both- their individual and official capacities in the district court. The operative complaint asserted claims against the Deputies for the violation of Hensley’s Fourth Amendment right to be free from unreasonable seizure, as enforced by 42 U.S.C. § 1983. As relevant here, the complaint also asserted supplemental claims under North Carolina law, including: (1) assault; (2) negligent infliction of emotional distress, (“NIED”); and (3) wrongful death, pursuant to N.C. Gen. Stat. § 28A-18-2.[3] The plaintiffs, sought both compensatory and punitive damages. ' After discovery, the Deputies moved for summary judgment, arguing that they were entitled to qualified immunity from the plaintiffs’ individual-capacity § 1983 claims on the ground that they acted reasonably in using deadly force. They also contended that they were entitled to public official immunity and related defenses under North Carolina law on the plaintiffs’ individual capacity assault, NIED-, and wrongful death claims. Finally, the Deputies argued that, if the court resolved their immunity defenses favorably to them, the plaintiffs’ official capacity claims failed as a matter of law. The district court entered an order denying the Deputies’ motion for summary judgment on the issue of qualified immunity, and concluded that: [T]he legal question. is whether [the] [plaintiffs’ forecast of evidence can give rise to a reasonable inference that the [Djeputies objectively lacked probable cause to believe that [Hensley] posed a threat of serious physical harm to them. Taking the evidence in the light most favorable to the [plaintiffs, .... a reasonable jury could conclude that the [Deputies] had no objective basis upon which they could base a decision to use deadly force against [Hensley]. Hensley v. Suttles, 167 F.Supp.3d 763, 762 (W.D.N.C. 2016), The district court also rejected the Deputies’ public official immunity defense and other state defenses on the same ground. Id. at 766-67. The Deputies noted a timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291 and the collateral order doctrine. Winfield v. Bass, 106 F.3d 526, 528-29 (4th Cir. 1997) (“To the extent that an order of a district court rejecting a governmental official’s qualified immunity defense turns on a question of law, it is a final decision within the meaning of § 1291 under the collateral order doctrine[,]”). See generally Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). II. The Deputies raise two arguments on appeal. First, they contend that the' district court erred in denying them qualified immunity from suit and allowing the plaintiffs’ § 1983 claim to proceed. Second, the Deputies argue that the district court erred in denying the application of their North Carolina state law defenses, A.. This Court reviews the district court’s denial of qualified immunity de novo, taking all the facts in the light most favorable to the non-moving party,, here, the plaintiffs. Pegg, 845 F.3d at 117. As a practical matter, this means that the Court “acceptfs] the facts as.the district court articulated them when it determined whether summary judgment was appropriate, and then ... determine^] whether, based on those facts, a reasonable person in the [Deputies’] position could have believed that [they] w[ere] acting in conformity. with clearly established law at the time.” Id. We also review.the denial of public official immunity, and other state law defenses de novo. See Bailey v. Kennedy, 349 F.3d 731, 739 (4th Cir. 2003). B, In reviewing a denial of summary judgment based on qualified immunity, we may only consider whether, on the undisputed facts and the facts considered in the light most favorable to the plaintiffs, the defendants violated clearly established law. See Iko v. Shreve, 535 F.3d 225, 233-35 (4th Cir. 2008). In this procedural posture, we may not credit defendant’s evidence, weigh the evidence, or resolve factual disputes in the defendants’ favor. For example, ,we may not take as true the Deputies’ assertion that once Hensley stepped off the porch he had the muzzle of the gun pointed toward them in a “shoot-from-the-hip” position. Similarly, we may not accept their contention that when Hensley stepped onto the porch he initially pointed the gun at them. While a jury could well believe the evidence forecast by the Deputies, we take the facts in the light most favorable to the plaintiffs to determine the applicable questions of law and ignore any contrary factual claims.[4] See Mitchell v. Forsyth, 472 U.S. 511, 528-29, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (observing that the “question of immunity is separate from the merits of the underlying action for purposes of [an interlocutory appeal under the collateral order doctrine] even though a reviewing court must consider the plaintiffs factual allegations in resolving the immunity issue”); Pegg, 845 F.3d at 117. III. A. We turn first to the Deputies’ qualified immunity argument related to the plaintiffs’ § 1983 claim. 1. Section 1983 “creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States.” Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013). In the case at bar, the plaintiffs have alleged that the Deputies violated Hensley’s Fourth Amendment right to be free from unreasonable seizures. Even though the plaintiffs have alleged a constitutional violation, the Deputies are “entitled to invoke qualified immunity, which is more than a mere defense to liability; it is immunity from suit itself,” if they meet the requirements. Id.; see also Mitchell, 472 U.S. at 526, 105 S.Ct. 2806. “Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.” Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Under the two-step process set out by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), we may ask “whether a constitutional violation occurred.” Henry, 652 F.3d at 531. If we conclude that a constitutional violation has occurred, we then examine “whether the right violated was clearly established.” Id. A right is “clearly established” when “its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Cooper, 735 F.3d at 158 (internal alteration and quotation marks omitted). Although we may exercise our discretion in determining which of the two prongs to analyze first, Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), the Deputies have failed to raise—and, therefore, have waived—any argument that the right at issue was not clearly established. See Fed. R. App. P. 28(a)(8)(A) (“[T]he argument ... must contain ... appellant’s contentions and the reasons for them[.]”); Edwards v. City of Goldsboro, 178 F.3d 231, 241 n.6 (4th Cir. 1999) (noting failure to comply with Rule 28 results in abandonment on appeal).[5] Consequently, we examine only the first Saucier prong, “whether a constitutional violation occurred.” That inquiry asks: when viewing the facts in the light most favorable to the plaintiffs, did the Deputies violate Hensley’s Fourth Amendment right to be free from unreasonable seizures when deadly force was exercised against him? “The use of deadly force is a seizure subject to- .,; the Fourth Amendment,” Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). “A reasonable officer- is entitled to use deadly force where [he] has probable cause to believe that a suspect poses a threat of serious physical harm, either to [himself] or to others.” Cooper, 735 F.3d at 159 (internal alterations and quotation marks omitted) (emphasis added). To determine whether such probable cause existed here, we ask whether the Deputies’ use of deadly force was “objectively reasonable in light of the facts and circumstances confronting them, [viewed in the light most favorable to the plaintiffs,] without regard to [the Deputies’] underlying intent or motivation.” Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). We assess the reasonableness of their conduct based on the totality of the circumstances, Yates v. Terry, 817 F.3d 877, 883 (4th Cir. 2016), and based on the information available to the Deputies “immediately prior to and .at the very moment they fired the fatal shots,” Greenidge v. Ruffin, 927 F.2d 789, 792 (4th Cir. 1991) (internal alterations and quotation marks omitted). With these guiding principles in mind, we turn to the Deputies’ argument, 2. The Deputies contend that the district court erred in denying their motion for summary judgment on the plaintiffs’ § 1983 claim because their use of deadly force against Hensley was reasonable under the circumstances. To support their argument, the Deputies " maintain that, even viewing the facts in the light most favorable to the plaintiffs, it is clear that Hensley emerged from his home with gun in hand, that Hensley hit Ferguson shortly before coming off the porch and advancing toward them, and that the entire series of events took only a brief time. The Deputies posit that their use of deadly force against Hensley in such circumstances was clearly reasonable because he both demonstrated a propensity for violence and came toward them with a gun.' In rejoinder, the plaintiffs contend that the Deputies acted unreasonably for two reasons. First, the plaintiffs point out that under their version of the facts, when the Deputies killed 'Hensley, he was pointing the gun at the ground and was threatening neither the Deputies nor his-daughters. As the plaintiffs proffer, Hensley’s altercation with Ferguson had concluded by the time he walked off the porch; therefore, because he never raised his weapon toward the Deputies, he was not immediately threatening to anyone at the scene. Second, the plaintiffs argue that the Deputies’ actions were all the more unreasonable here because they shot without warning HenSley to drop the gun or communicating with him in any way. At this stage of the proceedings, we must agree with the plaintiffs. If a jury credited the plaintiffs’ evidence, it could conclude that the Deputies shot Hensley only because he was .-holding a gun, although he never raised the gun to threaten the Deputies. Indeed, he never pointed the gun at anyone. Moreover, the Deputies had ample time,, under the plaintiffs’ evidence, to warn Hensley to drop his gun or stop before shooting him, but they concede they never gave any such.,warning. Because the use of force in such circumstances would be objectively unreasonable, we must -affirm the district court’s summary judgment order denying the.Deputies qualified immunity on the § 1983 claim. First, if we assume, as we must, the credibility of the plaintiffs’ evidence, we cannot say that Hensley posed a threat of serious physical harm to either the Deputies or his daughters at the time the Deputies fired the fatal shot. The lawful possession of a firearm by a suspect at his home, without more, is an insufficient reason to justify the use of deadly force. •Indeed, it is unreasonable for an officer to believe “that a suspect poses a threat of serious , physical harm, either to [himself] or to others,” merely because that suspect possesses a firearm. Cooper, 735 F.3d at 159 (internal alterations and quotation marks omitted); see also Pena v. Porter, 316 Fed.Appx. 303, 312 (4th Cir. 2009) (“Absent any additional factors which would give [officers] probable cause to fear for their safety or for the safety of others, the mere presence of a weapon is not sufficient to justify the use of deadly force.”). Under the plaintiffs’ version of the facts, this case bears a noteworthy resemblance to our decision in Cooper v. Sheehan— another case where law enforcement used deadly force against a non-threatening suspect. There, the officers responded to a domestic disturbance at Cooper’s home. Cooper, 735 F.3d at 155. Rather than announce their presence, one officer simply “tapped on the window .[of Cooper’s home] with his flashlight.” Id. (internal quotation marks omitted). In response, Cooper “peered out the back door” and “called out for anyone in the yard to identify himself,” but the officers did not respond. Id. Faced with silence, Cooper went outside to investigate the noise and brought with him a twenty-gauge shotgun. Id. “With the butt of the firearm in his right hand and its muzzle pointed toward the ground, Cooper opened the back door and took two or three steps on to his darkened porch.” Id. (internal quotation marks omitted). By that time, the officers were out of Cooper’s line of sight; nor could they see him. Id. When Cooper came upon the officers, “[reacting to the sight of Cooper and his shotgun, the [officers. drew their service weapons and commenced firing without warning.” Id. at 156. On those facts, we held that the officers’ use of deadly force violated Cooper’s Fourth Amendment rights because Cooper never raised the shotgun toward the officers and “the mere possession of a firearm by a suspect is not enough to permit the use of deadly force.” Id. at 159. We reasoned, “an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon.” Id. So too here. The Deputies responded to a domestic disturbance at Hensley’s home, but- had no specific information about the situation. When they arrived-shortly after dawn, Hensley and his daughters stepped out of the home and onto the porch. Hensley had a handgun, but never raised it toward the Deputies. According to the plaintiffs’ evidence, if believed by a jury, Hensley made no threatening statements or actions toward anyone in the moments immediately preceding the shooting. Instead, Hensley stepped off the porch and into the yard, keeping the handgun pointed toward the ground at all times. Nevertheless, almost' immediately after he stepped into the yard, the Deputies opened fire on Hensley and killed him without warning. If a jury credited the plaintiffs’ version of the facts, it could reasonably conclude that because Hensley never raised the gun to the' officers, and because he never otherwise threatened them, the Deputies shot Hensley simply because he had possession of a firearm. As we held-in Cooper, such conduct violates the Fourth Amendment. Cf. 735 F.3d at 158-60. Moreover, although the plaintiffs admit that Hensley and Ferguson were engaged in a brief altercation on the porch, that fact does not change our calculus. The short struggle between Hensley and Ferguson had little bearing on whether Hensley was prepared to take the substantial step of escalating a domestic disturbance into a potentially deadly confrontation with two armed police officers. Thus, under the plaintiffs’ version of the facts, no reasonable officer could have believed that Hensley posed a threat of serious physical harm to the Deputies at the time they used deadly force against him. Nor are we persuaded that Hensley’s attack on Ferguson made the Deputies’ use of deadly force imperative to protect her from serious physical injury. When the Deputies fired on Hensley, his physical conflict with Ferguson had ended. Hensley had ventured off the porch, away from Ferguson, and out into the yard. See Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005) (“[FJorce justified [in one moment] is not justified even seconds later if the justification for the initial force has been eliminated.”). Whether the Deputies could have used deadly force during Hensley’s altercation with Ferguson is not at issue here. But assuming the Deputies could have done so, by the time Hensley made it down the steps and into the yard, any “justification for the initial force ha[d] been eliminated.” Id.[6] In any event, even if the Deputies reasonably could have believed that Hensley posed a threat of serious physical harm, their failure to warn him—or to order him to drop the gun—before employing deadly force creates an additional impediment. Before an officer may use deadly force, he should give a warning if it is feasible. See Gamer, 471 U.S. at 11-12, 105 S.Ct. 1694 (“[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.” (emphasis added)). We have reasoned that a warning is not feasible if “the hesitation involved in giving a warning could readily cause such a warning to be [the officer’s] last.” McLenagan v. Karnes, 27 F.3d 1002, 1007 (4th Cir. 1994); see also id. (noting that, there, “a warning might easily have cost the officer his life”); cf. Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996) (holding that an officer’s use of deadly force was reasonable when a handcuffed suspect pointed a small handgun at him and the officer ordered the suspect to drop his weapon, which the suspect ignored). More simply put, an officer should give a warning before using deadly force unless there is an immediate threatened danger. Because a jury crediting the plaintiffs’ version of the facts could conclude that the Deputies were not in any immediate danger when they fired their weapons, the failure to warn Hensley also weighs against them. In the moments leading up to the fatal'shooting, the Deputies watched Hensley descend the steps from the porch into the yard. They watched him pause and look back to the house. And they briefly watched as Hensley walked toward them. While this scene played out in front of them, the Deputies concede they never ordered Hensley to drop the gun or warned that they would shoot. While we have no doubt the circumstances confronting the Deputies were tense and fast moving, that fact alone does not obviate Garner ⅛ warning admonition. The Deputies contend that none of the reasons noted above are a sufficient basis upon which to affirm the district court’s denial of qualified immunity. To support their argument, they direct us to four cases in which we extended qualified immunity to officers who used deadly force: Anderson v. Russell, 247 F.3d 125 (4th Cir. 2001); Sigman v. Town of Chapel Hill, 161 F.3d 782 (4th Cir. 1998); Elliott, 99 F.3d 640; and Slattery v. Rizzo, 939 F.2d 213 (4th Cir. 1991). According to the Deputies, these cases compel the opposite result from that reached by the district court. We disagree. Anderson and Slattery are factually different from the case at bar in legally significant ways. In Anderson, this Court concluded that a Maryland police officer was justified in using deadly force when a subdued suspect repeatedly lowered his hands toward what the officer perceived to be a gun, in violation of the officer’s verbal commands. See 247 F.3d at 128-29, 130-32. Even though the suspect was merely trying to turn off his Walkman, we observed that “[a]ny reasonable officer in [the officer’s] position would have imminently feared for his safety, and the safety of others.” Id. at 131. Likewise, in Slattery, we concluded that a Virginia police officer was justified in using deadly force when a suspect in the passenger seat of a stopped car repeatedly lowered his hands toward an object out of the officer’s view, in violation of the officer’s commands. 939 F.2d at 214-17. Although the object turned out to be a beer bottle, id. at 215, this Court held that “a reasonable officer [nevertheless] could have had probable cause to believe that [the plaintiff] posed a deadly threat,” id. at 216-17. In both cases, once the officer issued a verbal command, the character of the situation transformed. If an officer directs a suspect to stop, to show his hands or the like, the suspect’s continued movement likely will raise in the officer’s mind objectively grave and serious suspicions about the suspect’s intentions. Even when those intentions turn out to be harmless in fact, as in Anderson and Slattery, the officer can reasonably expect the worst at the split-second when he acts. Here, the Deputies gave Hensley no command to stop, drop the gun, or raise his hands. Because they gave no warning, the Deputies had no reason to suspect that Hensley posed an immediate threat other than’ the fact that he was holding a gun that was not pointed at them, but at the ground. .Such conduct runs headlong into our holding in Cooper: “the mere possession of a firearm by a suspect is not enough to permit the use of deadly force.” 735 F.3d at 159. Sigman is similarly unhelpful to the Deputies’ position. Hensley’s conduct in the moments before his death bears little resemblance to the suspect in Sigman. There, we held that a North Carolina police officer was justified in using deadly force against a suspect who, despite the surrounding police officers’ commands to stop, advanced on him with a knife. 161 F.3d at 787. Prior to the shooting, the suspect had threatened, to kill—at various times—himself, his girlfriend, and the officer. Id. at 784-85, 787. The .suspect also had swung a knife at the officer through an open window in his home. Id.. On those facts, we approved the use of deadly force because the suspect “was willing to use his knife on others,” had made threats on the officer’s life, and did not obey the officer’s commands to stop, Id. at 787. In Elliott, the defendant officers shot and killed a suspect who, while restrained in handcuffs in a police car, pointed a gun at, them and ignored the officers’ order to drop the weapon. See 99 F.3d at 642-43. The facts here, when viewed most favorably to the plaintiffs, also' bear no resem-blancé to the facts of Elliott. Hensley never pointed the gun at the Deputies nor received a command to stop or drop the gun. In sum, we conclude that the district court correctly denied the requested grant of qualified immunity. If a jury were to credit the plaintiffs’ evidence, it could conclude that Hensley never raised the gun, never threatened the Deputies, and never received a warning command. In that circumstance, the Deputies were not in any immediate danger and were not entitled to shoot Hensley. Under those circumstances, the Deputies are not entitled to. qualified immunity. B. We next address the Deputies’ arguments as to the plaintiffs’ state law claims. 1. The Deputies first argue that the plaintiffs’ assault claim fails as a matter of law, relying principally on the arguments they advanced in support of their qualified immunity.defense.[7] We disagree. Under North Carolina law, a plaintiff may maintain a civil action for assault arising from an arrest if' it is accomplished by excessive force. See Myrick v. Cooley, 91 N.C.App. 209, 371 S.E.2d 492, 496 (1988).[8] “Although the officer has discretion, within reasonable limits, to judge the degree of force .required under the circumstances, when there is ■ substantial evidence of unusual force, it is for the jury to decide whether the officer acted as a reasonable and prudent person or. whether he acted arbitrarily and maliciously.” Id. (internal quotation marks omitted). “The question of whether an officer has used excessive force is judged by a standard of objective reasonableness.” Jordan v. Civil Service Bd., 153 N.C.App. 691, 570 S.E.2d 912, 917 (2002) (internal alteration and quotation marks omitted), As previously noted, the facts taken in the light most favorable to 'the plaintiffs show that the Deputies’ conduct was not objectively reasonable. The evidence viewed in that light indicates that the Deputies shot Hensley under no imminent threat and without warning. Thus, the district court correctly concluded that plaintiffs’ assault claim could proceed as a matter of law. 2. We next address the Deputies’ assertion that they are entitled to public official immunity under North Carolina law on the plaintiffs’ NIED and wrongful death claims, as well as on the issue of whether they would be able to seek punitive damages in conjunction with their state tort claims.[9] Public officials in North Carolina usually are immun.e from suit for actions taken in their official- capacities. See Grad v. Kaasa, 312 N.C. 310, 321 S.E.2d 888, 890 (1984). A deputy sheriff carrying out his duties is such a public official. See Messick v. Catawba Cty., 110 N.C.App. 707, 431 S.E.2d 489, 496 (1983), abrogated on other grounds by Boyd v. Robeson Cty., 169 N.C.App. 460, 621 S.E.2d 1 (2005). Thus, the Deputies would be entitled to public official immunity so long as they did not act (1) “outside the scope of [their] official authority,” (2) with malice, or (3) in a corrupt manner. Wilcox v. City of Asheville, 222 N.C.App. 285, 730 S.E.2d 226, 230 (2012). Before the district court, the plaintiffs argued that the Deputies acted with malice. Public official immunity “is unavailable to officers who violate clearly established rights because an officer acts with malice when he does that, which a man -of reasonable intelligence would know to be contrary to his. duty.” Bailey, 349 F.3d at 742 (internal quotation marks omitted). Under North Carolina law, a law enforcement officer has a duty not to use deadly force upon another person unless, among other things, it is “reasonably necessary ... [t]o defend himself or a third person from what he reasonable believes to be the use or imminent use of deadly physical force [or] [t]o effect an- arrest[.]” N.C. Gen. Stat. § 15A-401(d)(1)-(d)(2). Once again, taking the evidence in the light most favorable to the plaintiffs, the district court correctly denied the Deputies public official immunity because the use of deadly force was not reasonably necessary under the. circumstances.[10] Under that view of the- evidence, the Deputies shot Hensley, despite the fact that he posed no immediate threat of serious harm to. either them or his daughters. Hensley simply walked down the porch stairs and into the yard with his gun pointed toward the ground. The Deputies then shot Hensley without any warning. The evidence so construed could lead a jury to reasonably conclude that the Deputies acted with malice under North Carolina law. Accordingly, we must conclude at this stage of the proceedings that the Deputies acted contrary to their duty to use deadly force only when reasonably necessary. In that circumstance, the Deputies are , not entitled to public official immunity under North.Carolina law. IV. For these reasons, we conclude that the district' court appropriately denied the Deputies qualified immunity on the plaintiffs’ § 1983 claim and state law assault claim, as well as public official immunity on their NIED, wrongful death and punitive damages claims brought under North Carolina law. The judgment of the district court is AFFIRMED. . The plaintiffs also sued West American Insurance Co. and The Ohio Casualty Insurance Co., which are also parties to this appeal. The insurance companies concede that under North Carolina law, the plaintiffs’ claims against them rise and fall with the claims against the Deputies. See generally N.C. Gen. Stat. § 162-8 (requiring sheriffs to be bonded); White v. Cochran, 229 N.C.App. 183, 748 S.E.2d 334, 339 (2013) (noting that the sheriff may be sued only "where the surety is joined as a party”; collecting cases). Because we affirm the district court's order denying the Deputies immunity from suit, we also affirm the district court’s denial of summaty judgment to West American and Ohio Casualty. . We refer to the Deputies' conduct jointly here and throughout this opinion because the plaintiffs treat them as one actor. .' The district court had original jurisdiction over the plaintiffs' § 1983 claim under 28 U.S.C. § 1331. It had supplemental jurisdiction over each of the plaintiffs’ state law claims under 28 U.S.C. § 1367. The complaint also asserted additional claims under the North Carolina constitution, as well as for the state law tort of intentional infliction of emotional distress. The plaintiffs' Voluntarily abandoned their state constitutional claims. The district court granted the Deputies summary judgment on the plaintiffs’ intentional infliction of emotional distress claim.[1] Neither claim is at issue in this appeal. . We note the forecast of most of the relevant evidence in this case is at polar opposites. Indeed, if the undisputed evidence were as forecast by the Deputies, they would likely be entitled to qualified immunity. However, that is not the state of the record at the summary judgment stage. . The dissent disagrees with our waiver analysis. See Dissenting Op. § II.B.l. But the Rules of Appellate Procedure are quite clear: “[a brief’s argument section] must contain ... [the] appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.” Fed. R. App. P. 28(a)(8)(A) (emphasis added). Appellate courts "are not like pigs, hunting for truffles buried in briefs.” United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam). Similarly, it is not our job "to wade through the record and make arguments for either party.” Friedel v. City of Madison, 832 F.2d 965, 969 (7th Cir. 1987). Here, the Deputies’ opening brief contains none of the development required by the rule. It contains no argument on the "clearly established” prong of the qualified immunity test. It contains no citation to cases actually applying the "clearly established” prong of the qualified immunity test. And it contains no citations to the record to indicate that the Deputies preserved the argument below. The dissent tacitly acknowledges the Deputies’ abdication on this point, as it can only muster two instances in which the Deputies mention the second prong of the qualified immunity test in their opening brief. And even then, a cursory reading reveals that they do so only in a boilerplate recitation of the applicable legal standard. The dissent cannot bolster its faulty waiver analysis by referencing and analyzing irrelevant concerns. For example, the dissent points out that the Deputies referenced the second prong of the qualified immunity analysis in a Rule 28(j) letter. While true, that does not alter our analysis. Nor could it. Under the Rules of Appellate Procedure, waiver is analyzed based on the content of the opening brief; again, ”[a brief's argument section] must contain ... [the] appellant’s contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.” Fed. R. App. P. 28(a)(8)(A). We have held that this rule does not allow for preservation where an argument is raised for the first time in a reply brief. See A Helping Hand, LLC v. Balt. Cty., 515 F.3d 356, 369 (4th Cir. 2008). It follows all the more strongly that a Rule 28(j) letter, filed after even the reply brief, is a wholly inappropriate and ineffectual means of preserving an argument on appeal. In fact, we have so held; "We do not countenance a litigant’s use of Rule 28(j) as a means to advance new arguments couched as supplemental authorities.” United States v. Ashford, 718 F.3d 377, 381 (4th Cir. 2013). Were we to treat Rule 28(j) as an independently sufficient means of advancing an argument not raised in the briefs we would run "the risk of [issuing] an improvident or ill-advised opinion ... on an un-briefed issue.” Ashford, 718 F.3d at 381. Thus, by failing to preserve the issue in their opening brief, the Deputies waived it. No subsequent filing can revive it. Our dissenting colleague also overstates the perceived inefficiency of finding a waiver at this stage. As the dissent sees it, the Deputies could raise the second prong of the qualified immunity test again on remand, which they could then appeal. That construct, however, contravenes the operation of the mandate rule. The mandate rule is a "specific application of the law of the case doctrine” that "forecloses relitigation of issues expressly or impliedly decided by the appellate court” on remand. United States v. Bell, 5 F.3d 64, 66 (4th Cir. 1993). To be sure, the Deputies may again raise qualified immunity at an appropriate time at trial, but the mandate rule prohibits a "do-over” at the summary judgment stage. See Willingham v. Crooke, 412 F.3d 553, 559 (4th Cir. 2005) ("Thus, while the purely legal question of whether the constitutional right at issue was clearly established is always capable of decision at the summary judgment stage, a genuine question of material fact regarding whether the conduct allegedly violative of the right actually occurred must be reserved for trial.”) (internal alterations and quotation marks omitted); see also Behrens v. Pelletier, 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (indicating that a government defendant may raise qualified immunity, once denied, at a subsequent stage of a proceeding because a different legal standard and inquiry governs). But although the Deputies may be able to pursue qualified immunity at a later stage of the proceeding, the mandate rule "restricts the district court’s authority on remand” to reconsider that issue in a summary judgment motion. Doe v. Chao, 511 F.3d 461, 465 (4th Cir. 2007). Any harshness the waiver rule engenders is offset by its clarity: a party must do more than "take[ ] a passing shot at [an] issue” to properly preserve it for appellate review. Grayson O Co. v. Agadir Int'l LLC, 856 F.3d 307, 316 (4th Cir. 2017). The party must actually "develop [its] argument.” Belk, Inc. v. Meyer Corp., 679 F.3d 146, 152 n.4 (4th Cir. 2012). Here, the Deputies' bare recitation of the elements of a qualified immunity defense does not clear that hurdle. They failed to "take a passing shot at the issue.” As appellants, they were required to state their “contentions and the reasons for them.” Fed. R. App. P. 28(a)(8)(A). This, the Deputies utterly failed to do. . Our dissenting colleague maintains that no constitutional violation occurred, but cites only generalities and otherwise irrelevant facts to support that conclusion. In cases like this one, we must evaluate all of the facts and circumstances. Graham, 490 U.S. at 397, 109 S.Ct. 1865. We are not permitted to make credibility determinations or weigh competing evidence. As discussed in detail above, the facts,- viewed in the light most favorable to the plaintiffs, suggest that Hensley had walked away from Ferguson and did not threaten serious physical harm against the Deputies at the time they shot him. Nor do we put much stock in the dissent’s assertion that Hensley "responded to the[] [Deputies’] presence by immediately retrieving a gun and coming outside to confront them.” Dissenting Op. 593. While true that Hensley retrieved the gun in response to the Deputies’ presence, that fact was not known to them at the time the fatal shot was fired. Consequently, that fact is irrelevant to our analysis. Greenidge, 927 F.2d at 792. . While the district court's denial of summary judgment on the plaintiffs' assault claim is not ordinarily immediately appealable under the collateral orders doctrine, we nevertheless may exercise appellate jurisdiction under the doctrine of pendent appellate jurisdiction, Pendent appellate jurisdiction is "a judicially-created, discretionary exception to the final judgment requirement. Rux v. Republic of Sudan, 461 F.3d 461, 475 (4th Cir. 2006). This exception is "narrow” and applies only “(1) when an issue is inextricably intertwined with a question that is the proper subject of an immediate appeal”; or (2) "when review of a jurisdictionally insufficient issue is necessary to ensure meaningful review of an immediately appealable issue.” Id. (internal quotation marks omitted). Claims are “inextricably . intertwined if the same specific question will underlie both the appealable and the non-appealable [claims], such that resolution of the question will necessarily resolve [both claims] at once.” Scott v. Fam. Dollar Stores, Inc., 733 F.3d 105, 111 (4th Cir. 2013). Here, because our analysis of the assault claim turns entirely on our analysis of the Deputies’ qualified immunity defense,. the Deputies’ challenge to that claim is "inextricably intertwined” with that defense, . We note that the issue of whether public official immunity can apply to intentional tort claims, like the plaintiffs’ assault claim, splits courts in North Carolina. Compare, e.g,, Hawkins v. State, 117 N.C.App. 615, 453 S.E.2d 233, 242 (1995) (holding that public official immunity does not apply to intentional tort claims), with Campbell v. Anderson, 156 N.C.App. 371, 576 S.E.2d 726, 730 (2003) (concluding otherwise). In an unpublished decision, we previously have applied public official immunity to intentional tort claims. See Ayala v. Wolfe, 546 Fed.Appx. 197, 202 (4th Cir. 2013), Because we resolve the assault claim on the same reasoning used by the district court, it is unnecessary to address the application of the public official immunity bar as it relates to this claim. . We have jurisdiction over the Deputies' interlocutory appeal of the public official immunity issue under the collateral order doctrine because, under North Carolina law, public official immunity, like qualified immunity, "is an immunity from suit.” Bailey, 349 F.3d at 738-39. . Here too, the Deputies have waived any argument that the violation at issue here was not "clearly established.”