**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————

**No. 23-1680**

—————

LATOYA K. BENTON, Administrator of the Estate of Xzavier D. Hill, Deceased,

Plaintiff – Appellant,

v.

SETH W. LAYTON, Individually and in his official capacity as a State Trooper for the Virginia State Police; BENJAMIN I. BONE, Individually and in his official capacity as a State Trooper for the Virginia State Police,

Defendants – Appellees.

—————

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Henry E. Hudson, Senior District Judge.  (3:22-cv-00225-HEH)

—————

Argued:  May 9, 2024                                      Decided:  June 3, 2025

—————

Before THACKER, QUATTLEBAUM, and BENJAMIN, Circuit Judges.

—————

Affirmed by published opinion.  Judge Benjamin wrote the opinion, in which Judge Thacker and Judge Quattlebaum joined.

—————

**ARGUED:**  Zachary William Ezor, TIN FULTON WALKER & OWEN, PLLC, Durham, North Carolina, for Appellant.  Frederick William Eberstadt, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.  **ON BRIEF:**  Jason S. Miyares, Attorney General, Charles H. Slemp, III, Chief Deputy Attorney General, Calvin C. Brown, Senior Assistant Attorney General, Andrew N. Ferguson, Solicitor General, Erika L. Maley, Principal Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

DEANDREA GIST BENJAMIN, Circuit Judge:

On January 9, 2021, 18-year-old Xzavier D. Hill was shot and killed by Virginia State Troopers Seth W. Layton and Benjamin I. Bone (collectively "Defendants"). Hill's estate, with his mother, LaToya K. Benton ("Plaintiff"), acting as administrator, filed a complaint in the United States District Court for the Eastern District of Virginia alleging Defendants used excessive force in violation of 42 U.S.C. § 1983 and committed state law torts. Defendants filed a motion for summary judgment contending they were entitled to qualified immunity. The district court granted the motion. This court's precedent forecloses a finding that Defendants utilized excessive force and there is no Supreme Court or Fourth Circuit precedent that clearly established Defendants' actions were unconstitutional. Therefore, we affirm the judgment of the district court.

## I.

At 4:35 a.m. on January 9, 2021, Defendants were in a marked police vehicle in a highway median, with Layton in the driver's seat. Hill passed Defendants on the highway, Dashcam at 1:42,[1] and Layton U-turned from their position and drove up the three-lane highway. Bone confirmed with Layton that they were moving at 96 miles per hour. *Id.* at 2:07. At around Dashcam 2:37, Defendants caught up with Hill, and at Dashcam 2:51, Defendants again confirmed they were moving at a high rate of speed. *See id.* (Layton saying "[w]e're going 96 right now, 94"). Layton noted a few seconds later that "[Hill] is

---

[1] References to "Dashcam" refer to Defendants' police vehicle dashcam.

swerving," and it is clear on the dashcam that Hill, generally situated in the middle lane, was veering into and out of neighboring lanes. *Id.* at 2:56. At Dashcam 3:23, Defendants sped up to get directly behind Hill, and at Dashcam 3:37, Layton activated the police vehicle's blue lights. Hill immediately began pulling away from the police vehicle, and the engine throttle on the police vehicle can be heard as Defendants pursued him. *Id.* Layton then asked, "Did he turn his lights off?" *Id.* at 3:49. When the blue lights were activated, Hill's vehicle lights turned off, *id.* at 3:37, but it is unclear from the dashcam why that occurred.

At Dashcam 3:53, Hill's vehicle began swerving again, crossing from the middle lane to the right lane and back. Defendants then activated the police vehicle's sirens. Hill suddenly slowed down, *id.* at 4:19, briefly extended his left arm out of the front driver's side window, *id.* at 4:23, and subsequently came to a near-complete stop, *id.* at 4:25. Hill then pulled onto the right embankment of the now two-lane highway and again settled to a near-complete stop. *Id.* at 4:33. Suddenly, Hill took a U-turn across the two lanes of the highway. *Id.* When he reached the left embankment (with his vehicle pointed backwards down the highway), his vehicle slid down a steep slope and settled at the bottom against the median's tree line. *Id.* at 4:33–4:40.

Layton parked the police vehicle on the highway with the vehicle's nose (and Dashcam view) pointed at Hill's vehicle. *Id.* at 4:40. Defendants exited the police vehicle, and Bone immediately issued three verbal commands to "Get out of the car now." *Id.* at 4:48. Defendants appear on the dashcam with their guns drawn and pointed at Hill, who

3

remained in his vehicle throughout the encounter.  The following verbal exchange occurred between Dashcam 4:48 and 5:06:

> BONE:  Get out of the car now!  Get out of the car now!  Get out of the car now!
>
> LAYTON:  Show me your hands!  Do it now!  Put your hands up!  Put your hands up!
>
> BONE:  You got him?  I got you.[2]
>
> LAYTON:  Put your hands up!  Let me see your hands!
>
> HILL:  My door doesn't open.
>
> BONE:  Put your hands up!
>
> HILL:  My door doesn't open.
>
> LAYTON:  Put your hands out the door!  Put your hands out the door!  Do it now!

At this point, Defendants had progressed to within a few feet of Hill's vehicle, with Layton to the left of Bone.  Mem. Supp. Summ. J. (D. ECF No. 43) at 6.[3]  In response to Layton's commands, Hill put his left arm out of the front driver's side window.  Dashcam at 5:07  His right arm remained in the vehicle at all times.  *Id.*  .  Layton then continued to issue commands:

> LAYTON:  Put your hands out the door!  Stop moving!

---

[2] Bone's words indicated that he was passing primary command authority to Layton. Mem. Supp. Summ. J. (D. ECF No. 43) at 7.

[3] Page numbers for citations to ECF documents utilize the page numbers in the red header on each document.

4

Right after this command, Hill quickly pulled his left arm inside the vehicle. Layton again commanded Hill to put his hands out the door.

Defendants then moved to a position nearly directly outside Hill's door. Between Dashcam 5:11 and 5:13, Bone moved to a position near the back driver's side door of Hill's vehicle, shined his flashlight into the vehicle, and then moved back to his original position near the front driver's side door.

LAYTON: Put your hands out the window! Put your hands out the window! Reaching, reaching, reaching!

As he said the above at Dashcam 5:14, Layton backed away from Hill's vehicle, and Bone swiftly stepped forward, positioning himself directly outside Hill's window. Bone pointed his flashlight directly into the window, and backed away quickly as the following was said near-simultaneously:

BONE: Stop reaching, he's got a gun!

LAYTON: Gun!

When Defendants commanded Hill to stop reaching, the Dashcam shows Hill making movements around the center console and obscured passenger side of his vehicle. Directly after the command to stop reaching, two gunshots were fired by Bone and one by Layton. *Id.* at 5:17. Bone fired one last gunshot at Dashcam 5:19. After firing, Defendants both said they could no longer see the gun. *Id.* at 5:23–6:38. Bone went around to the

passenger side of Hill's vehicle, where he found a gun in the front passenger seat. *Id.* at 6:51; J.A. 363–68.[4]  Hill died at the scene.

II.

A.

Plaintiff filed a complaint in federal district court alleging a Fourth Amendment excessive force claim pursuant to 42 U.S.C. § 1983 and state law claims.  Specifically, Plaintiff asserted that Defendants shot Hill while Hill "was trapped inside his vehicle, posed no danger to [Defendants] . . . and was pleading with [Defendants] his car door was stuck."  J.A. 18.

Defendants filed a motion for summary judgment claiming they were entitled to qualified immunity.  Defendants argued their use of force was objectively reasonable because Hill pointed a gun at Layton, Hill refused to follow commands to show his hands, and, even if the shooting was unjustified, that no Supreme Court or Fourth Circuit precedent clearly established their conduct was unlawful.  *See* Mem. Supp. Summ. J. at 21–30.

Plaintiff responded that Hill posed no danger to Defendants.  Plaintiff argued there was no reason for Defendants to get out of their vehicle and engage Hill, and that Hill complied when they began issuing commands.  *See* Mem. Opp'n. Summ. J. (D. ECF No. 46) at 20–21.  Plaintiff also asserted that "Hill did not pose an imminent threat to the safety

---

[4] Citations to "J.A." refer to the joint appendix filed by the parties.  The J.A. contains the record on appeal from the district court.

of [Defendants] . . . after Bone fired the first shot." *Id.* at 21.  So, even if the first gunshot was justified, the three subsequent gunshots were unlawful.

B.

The district court granted summary judgment in favor of Defendants.  The court found that Defendants were entitled to qualified immunity under both the constitutional and clearly established prongs.  *Benton v. Layton*, 675 F. Supp. 3d 606, 623 (E.D. Va. 2023).  On the constitutional prong, where the court considered whether "[Defendants'] actions were objectively reasonable," *id.* at 616, the court found that "[Defendants] reasonably believed that Hill posed a danger in disobeying [Defendants'] commands and reaching towards what they perceived to be—and actually turned out to be—a handgun," *id.* at 620.

On the clearly established prong, "the 'salient question' . . . ' "is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." ' " *Id.*  The court determined that "Plaintiff ha[d] not demonstrated that a reasonable officer would have understood, based on the information and knowledge [Defendants] possessed, that firing upon a non-compliant suspect who is reaching for what [Defendants] believe is a firearm would constitute a violation of the Fourth Amendment." *Id.*[5]

---

[5] The district court additionally found that "[b]ecause the state-law tort claims will fail or proceed with the success of Plaintiff's federal excessive force claim, the [c]ourt's finding that [Defendants] are entitled to qualified immunity precludes . . . [the] state-law tort claims from moving forward." *Benton v. Layton*, 675 F.Supp.3d 606, 623 (E.D. Va. 2023).

Plaintiff subsequently filed a notice of appeal.  We have jurisdiction pursuant to 28 U.S.C. § 1291.

III.

A.

"We review de novo district court decisions on motions for summary judgment and qualified immunity." *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023), *cert. denied Charlotte, NC v. Aleman*, 144 S. Ct. 1032 (2024) (citing *Franklin v. City of Charlotte*, 64 F.4th 519, 529 (4th Cir. 2023)).  "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Id.* at 283 (citations omitted).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (citations omitted).

"[T]he facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party." *Id.* at 283–84.  "That means 'we may not credit [the movant's contrary] evidence, weigh the evidence, or resolve factual disputes in the [movant's] favor,' even if 'a jury could well believe the evidence forecast by the [movant].' " *Id.* at 284 (alteration in original & citations omitted).

B.

"Qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known.' " *Brown v. Elliott*, 876 F.3d 637, 641 (4th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Franklin*, 64 F.4th at 530 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)). "[T]he qualified immunity analysis consists of two prongs: (1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation." *Aleman*, 80 F.4th at 284 (citing *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021)).

We have discretion to analyze the constitutional prong or the clearly established prong first. *See Rambert v. City of Greenville*, 107 F.4th 388, 398 (4th Cir. 2024) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Like the district court, we will address both prongs, beginning with the constitutional prong in section C, *infra*, and the clearly established prong in section D, *infra*.

## C.

The Supreme Court has directed courts to review excessive force cases pursuant to the Fourth Amendment's reasonableness standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). The *Graham* factors, which provide guideposts for this analysis, are: (1) the "severity of the crime" that is the subject of the stop or arrest, (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Analyzing the *Graham* factors "requires careful attention to the facts and circumstances of each particular case," *id.*, and "[i]n excessive force cases where an officer

9

uses deadly force, the second *Graham* factor is particularly important." *Franklin*, 64 F.4th at 531. As the court has explained:

> In these matters, the question comes down to whether the circumstances presented an immediate threat that justified the officer's resort to lethal force as objectively reasonable, "without regard to [the officer's] underlying intent or motivation." In other words, the Fourth Amendment permits the use of deadly force when a police officer "has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others."

*Id.* (alteration in original).

The inquiry under the constitutional prong is "based on the totality of the circumstances." *Aleman*, 80 F.4th at 285 (citation omitted). "[A] court cannot . . . 'narrow' the totality-of-the-circumstances inquiry, to focus on only a single moment. It must look too . . . at any relevant events coming before. *Barnes v. Felix*, __ S. Ct. __, __, No. 23-1239, 2025 WL 1401083, at *5 (U.S. May 15, 2025). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

i.

*Graham* factor one—the severity of the crime—weighs in favor of Defendants. It is undisputed that Hill was traveling over 90 miles per hour from the moment he passed Defendants in the highway median to when he slowed and U-turned at Dashcam 4:19. And

when Defendants activated their blue lights, Hill increased his speed and swerved across lanes. These actions—driving in a manner that could endanger the officers or other drivers—would have provided probable cause for felony disregarding signal by law-enforcement/eluding police pursuant to Virginia Code Ann. § 46.2-817(B).[6]

Plaintiff suggests that misdemeanor eluding pursuant to Virginia Code Ann. § 46.2-817(A)[7] would be the more appropriate alleged offense. *See* Appellant's Br. (ECF No. 14) at 20 (hereinafter "Opening Br."). But this would ignore that Hill drove recklessly at a high rate of speed on a dark highway, including making a U-turn across two lanes of traffic. Even when viewed in the light most favorable to Plaintiff, Hill's actions were indisputably calculated to elude officers and could have caused harm to both Defendants and other motorists. Thus, Hill's dangerous driving and attempts to evade Defendants are enough to weigh *Graham* factor one in their favor.

---

[6] "Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal so as to interfere with or endanger the operation of the law-enforcement vehicle or endanger a person is guilty of a Class 6 felony. It shall be an affirmative defense to a charge of a violation of this subsection if the defendant shows he reasonably believed he was being pursued by a person other than a law-enforcement officer." Va. Code Ann. § 46.2-817(B).

[7] "Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal or who attempts to escape or elude such law-enforcement officer whether on foot, in the vehicle, or by any other means, is guilty of a Class 2 misdemeanor. It shall be an affirmative defense to a charge of a violation of this subsection if the defendant shows he reasonably believed he was being pursued by a person other than a law-enforcement officer." Va. Code Ann. § 46.2-817(A).

11

ii.

*Graham* factor two—immediate threat to officers—also weighs in favor of Defendants. "Distilling general guiding principles from Fourth Circuit excessive force precedent is well-nigh impossible. There is nothing generic about the scenarios that lead a police officer to shoot another person." *Franklin*, 64 F.4th at 531. "When the [c]ourt has discerned an objective basis for lethal force, the case involved 'a person in possession of, or suspected to be in possession of, a weapon' who does not 'obey commands' and instead 'makes some sort of furtive or other threatening movement with the weapon.'" *Id.* (quoting *Knibbs v. Momphard*, 30 F.4th 200, 225 (4th Cir. 2022), *cert denied Momphard v. Knibbs*, 143 S. Ct. 303 (2022) (mem.)).

Here, it is uncontested that Layton gave four commands for Hill to put his hands out the door and two commands to put his hands out the window. It is also uncontested that between the third and fourth commands for Hill to put his hands out the door, he pulled his left arm *inside* the window. And it is uncontested that Hill never put his right hand or arm outside the window. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (recognizing facts should be viewed in the light depicted by the videotape and cautioning courts not to adopt a version of the facts blatantly contradicted by the record for the purposes of ruling at summary judgment); *see also Doriety for Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024) ("As the phrase 'blatantly contradicts' implies, '[t]his standard "is a very difficult one to satisfy"' and requires that the plaintiff's version of events be 'utterly discredited' by the video recording." (quoting *Lewis v. Caraballo*, 98 F.4th 521, 529 (4th Cir. 2024) (alteration in original))).

But it is disputed whether Hill ever held a gun in his hand or pointed it at Layton, or whether Defendants even saw a gun. The dashcam is not particularly helpful on this point. Neither party can reasonably assert that the dashcam clearly shows the presence or absence of a gun in Hill's hand. And, viewing the facts in Hill's favor, we are arguably constrained to review the available facts as if there was no gun in Hill's hand or pointed at Layton. *See Benton*, 675 F. Supp. 3d at 617 ("[E]ven though a firearm was recovered from the passenger seat, the [c]ourt acknowledges that the fact of whether Hill actually held the gun is in dispute, precluding a definitive finding at this stage that Hill pointed the gun at either of [Defendants].").

At the moment Hill was shot, however, it is clear from the dashcam that Layton gave several clear commands in a row, that Hill disobeyed these orders, and that he was reaching towards the center console/passenger side of his vehicle. This court's "furtive movement" cases are instructive.

In *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991), officers conducted a raid in an area that "had the reputation of being an open-air drug market" and a history of violent activity. *Id.* at 214. The officer in that case approached a car window and told the plaintiff to put his hands up several times. *See id.* at 215. When the plaintiff turned his upper body towards the officer with his left hand not fully visible but "partially closed around an object," the officer shot the plaintiff. *See id.*

In *Elliot v. Leavitt*, 99 F.3d 640 (4th Cir. 1996), an officer stopped the plaintiff and placed him in the front passenger seat of his police vehicle with the window up. *See id.* at 641. When speaking with another officer by the police vehicle, the first officer "noticed a

13

movement and looked to find [the plaintiff] with his finger on the trigger of a small handgun pointed at" both officers. *See id.* at 642. The officers shot the plaintiff after the first officer gave a clear command to drop the weapon. *See id.*

In *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001), an officer received a report from "a mall patron . . . that a man appeared to have a gun under his sweater, pointing to [the plaintiff]." *Id.* at 128. The officer "perceived a bulge consistent with the shape of a gun," and the plaintiff disregarded an order to put his hands up. *See id.* at 130. The plaintiff then "lower[ed] his hands in the direction of the bulge," and the officer shot him. *See id.*[8]

In sum, the court has consistently found that excessive force was justified where officers reasonably feared they were in imminent danger due to sudden movements that followed verbal commands. Plaintiff views these cases as requiring both an immediate sense of danger *and* "prior indication that . . . [a suspect] might be armed," Opening Br. at 28, as they involve officers either seeing a gun or being in areas or situations where they were primed to believe there were guns. *See id.* at 21–22. But there is no requirement in the Supreme Court's or this circuit's jurisprudence for officers to have prior knowledge of or suspicion that a suspect has a weapon—the inquiry is whether "a police officer 'has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others.' " *Franklin*, 64 F.4th at 531.

Whether there was a gun in Hill's hand or not, Layton gave six clear commands that Hill disobeyed, and Hill then made movements in direct violation of those commands.

---

[8] While there was a gun in *Elliot*, the plaintiffs in *Slattery* and *Anderson* were discovered to not have weapons.

14

Defendants could have reasonably perceived that Hill had a gun due to the "character of the situation [being] transformed" *See Knibbs*, 30 F.4th at 220. Our "focus . . . [is] on [Hill's] furtive movements *after* readily recognizable law enforcement officers ordered [him] to" put his hands out the window, stop moving, and drop a gun. *See Knibbs*, 30 F.4th at 221; *id.* at 222 (quoting *Anderson*, 247 F.3d at 131) ("[A]n officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action."); *see also Hensley ex rel. N. Carolina v. Price*, 876 F.3d 573, 585 (4th Cir. 2017) ("If an officer directs a suspect to stop . . . [and] show his hands . . . the suspect's continued movement likely will raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions.").

Looking beyond the "furtive movement" cases, Plaintiff also asks the court to apply a line of cases where a firearm was present, but officers were found to have had no objectively reasonable belief that the suspects were dangerous. These cases do not help Plaintiff. In those cases, the suspects were holding the weapons in nonthreatening ways *and* did not make movements that could reasonably be perceived as dangerous. *See, e.g., Cooper v. Sheehan*, 735 F.3d 153, 159–60 (4th Cir. 2013) (holding no qualified immunity where plaintiff heard sounds outside his home, stepped outside with a shotgun pointed at the ground, and officers immediately shot him); *Hensley*, 876 F.3d at 585 (holding no qualified immunity where plaintiff struck daughter with handgun and walked towards officers while holding handgun, and officers shot plaintiff without issuing any commands); *Aleman*, 80 F.4th at 292–93, 296 (holding no qualified immunity where body cameras established that plaintiff never pointed gun at officers and officers failed to have Spanish-

15

language interpreter present to issue clear commands); *Franklin*, 64 F.4th at 535 (holding no qualified immunity where officer shot plaintiff after issuing commands for him to drop his weapon and he was in the midst of complying).

In contrast, Layton gave clear commands to Hill. And Hill did not merely fail to comply but also made "furtive movements" in direct violation of those commands. Thus, *Graham* factor two weighs in favor of Defendants.

### iii.

*Graham* factor three—resisting arrest or evading arrest by flight—clearly weighs in favor of Defendants. Tracking the analysis for *Graham* factor one, Hill sped away from Defendants the moment blue lights were activated and attempted a U-turn across highway traffic to evade Defendants. We cannot accept Plaintiff's contention that though "Hill initially tried to evade [Defendants,] . . . by the time [Defendants] exited their cruiser, 'he stopped.' " *See* Opening Br. at 28 (citation omitted). Defendants only exited their police vehicle after Hill's vehicle became moored in the highway embankment—so Hill did not stop so much as he was unable to continue to evade by driving.

\*     \*     \*

All three *Graham* factors weigh in favor of Defendants. Therefore, we hold that Defendants are entitled to qualified immunity under the constitutional prong. We consider next the clearly established prong.

16

D.

i.

In assessing the clearly established prong, "[w]e . . . [are] not require[d] [to find] a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).

The Supreme Court has instructed "not to define clearly established law at too high a level of generality. . . . [T]he 'rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." ' " *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (quoting *Wesby*, 583 U. S. at 63).

ii.

There is no Supreme Court or Fourth Circuit caselaw that would have put Defendants on notice that their conduct was unlawful.

As discussed in section C-ii of this opinion, the "furtive movement" cases hold that officers may deploy lethal force when, after issuing clear commands, they reasonably perceive a suspect to be an immediate danger because of movements in violation of those commands. *See, e.g.*, *Slattery*, 939 F.2d at 214–17; *Elliott*, 99 F.3d at 641–42; *Anderson*, 247 F.3d at 128, 130. Plaintiff attempts to distinguish these cases by noting Hill's age and arguing he simply "failed to . . . [follow commands] perfectly." Opening Br. at 31. But there are no cases that stand for the proposition that officers cannot objectively perceive an immediate danger where a suspect in the driver's seat of a vehicle fails to follow commands to show his hands and thereafter makes movements towards the center console and

17

obscured passenger side of his vehicle in defiance of those commands. The line of cases dealing with the actual presence of a firearm similarly do not help Plaintiff. In those cases, the plaintiffs held their weapons in nonthreatening ways and did not make movements that could reasonably be perceived as dangerous. *See, e.g.*, *Cooper*, 735 F.3d at 159–60; *Hensley*, 876 F.3d at 585; *Aleman*, 80 F.4th at 292–93, 296; *Franklin*, 64 F.4th at 535.

Therefore, we hold that Defendants are independently entitled to qualified immunity under the clearly established prong.[9]

IV.

The premature death of an 18-year-old is tragic. But the only question before this court is whether Defendants are entitled to qualified immunity under the precedent of the Supreme Court and this circuit. For the reasons outlined above, we hold they are. Therefore, the judgment of the district court is affirmed.

*AFFIRMED*

---

[9] Because Plaintiff's federal excessive force claim fails, the "parallel state law claim[s]" that rely on the same reasonableness inquiry must fail as well. *See Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994); *see also Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998)(concluding that an officer's actions were reasonable in conducting a qualified immunity analysis at summary judgment and therefore rejecting a state law wrongful death claim because those actions could not be negligent or wrongful as we required by the statute).