**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-2237**

_____

JEFFERY PAYNE,

Plaintiff - Appellant,

v.

SGT. JOSHUA MOSER, individually and in his capacity as a Police Officer with Fairfax County Police Department,

Defendant - Appellee.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Michael Stefan Nachmanoff, District Judge.  (1:24-cv-00398-MSN-WEF)

_____

Argued:  October 21, 2025                    Decided:  April 13, 2026

_____

Before WILKINSON, GREGORY, and BERNER, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Berner wrote the opinion, in which Judge Wilkinson and Judge Gregory joined.

_____

**ARGUED:**  Andrew O. Clarke, DISTRICT LEGAL GROUP, PLLC, National Harbor, Maryland, for Appellant.  Kimberly Pace Baucom, FAIRFAX COUNTY ATTORNEY'S OFFICE, Fairfax, Virginia, for Appellee.  **ON BRIEF:**  Elizabeth D. Teare, County Attorney, FAIRFAX COUNTY ATTORNEY'S OFFICE, Fairfax, Virginia, for Appellee.

_____

BERNER, Circuit Judge:

Acting on a tip from an informant that Jeffery Payne was illegally dealing drugs, Sergeant Joshua Moser together with several other detectives from the Fairfax County Police Department arranged for a controlled drug buy in the parking lot of a commercial shopping complex. The controlled buy never took place, however. Instead, once he arrived at the complex, Payne became suspicious that something was amiss and began to drive out of the parking lot. The detectives pursued Payne in four unmarked vehicles, at least one of which was a black Ford F-150 pickup truck. Just as Payne neared a stop sign at the exit of the parking lot, Sergeant Moser directed the detectives to use their vehicles to stop Payne from leaving. The detectives first attempted to surround Payne's car with their vehicles. One detective rammed his vehicle into Payne's car, causing it to spin until it came to a stop near an embankment. The detectives then positioned their vehicles around Payne's car, blocking Payne inside. Seconds later, fearing that Payne was reaching for a gun, Sergeant Moser shot Payne through the back window of his car. The detectives later determined that Payne had been unarmed at the time of the incident.

Payne alleges that Sergeant Moser violated his constitutional rights under the Fourth Amendment by using excessive force in arresting him. The district court granted summary judgment to Sergeant Moser, concluding that Payne failed to produce sufficient evidence to genuinely dispute any fact material to his claims. The district court further concluded that, under the facts as found by the district court, Sergeant Moser's actions were objectively reasonable as a matter of law. The record before us, however, contains genuine disputes of material fact as to whether Sergeant Moser used excessive force, both in

2

directing the detectives to use their vehicles to forcibly stop Payne from leaving the location of the controlled buy and in shooting him. We therefore vacate the district court's grant of summary judgment and remand for further proceedings.

## I.    Factual Background

On summary judgment, we recount the facts in the light most favorable to the nonmoving party, here Payne. *Estate of Jones by Jones v. City of Martinsburg,* 961 F.3d 661, 664 (4th Cir. 2020).

The Fairfax County Police Department (FCPD) arranged a controlled drug buy between an informant and his narcotics supplier, Jeffery Payne, in the parking lot of a shopping complex. The plan called for a single undercover officer to accompany the informant in one vehicle, and detectives in four other vehicles to provide support to arrest Payne following the controlled buy. During a pre-operation briefing, the detectives agreed that they would have probable cause to arrest Payne if he arrived at the parking lot, regardless of whether the controlled buy actually occurred. The lead detective stressed that the detectives should be on alert because, according to the informant, Payne was often armed.

As planned, an undercover detective, Thomas Duffy, and the informant drove to the designated location in an unmarked vehicle. Detective Duffy wore a microphone to capture communications during the controlled buy. On the drive, the informant once again told Detective Duffy that Payne routinely carried a gun. The other detectives, including Sergeant Moser, overheard this discussion through Detective Duffy's wired microphone.

3

Detectives Taormina, Stepp, Mullins, Fletcher, and Sergeant Moser arrived in four other unmarked vehicles at the shopping complex parking lot. They positioned their vehicles at some distance away to avoid alerting Payne to their presence.

Payne arrived at the designated location as arranged, accompanied by another individual. Payne parked his car and waited inside it for several minutes, but—in his words—something just "didn't feel right." Parties' Joint Appendix (J.A.) 272. His "gut" told him to leave. J.A. 272. Payne pulled out of the spot where he had parked and slowly drove toward the parking lot exit. At that point, the undercover officer, Detective Duffy, got out of his vehicle and began walking towards Payne's car, waving his arms. Payne saw Detective Duffy but continued to drive away.

As Payne attempted to leave the shopping complex, the other detectives followed closely in their unmarked vehicles. Detective Taormina drove directly behind Payne in a black Ford F-150 pickup truck. As Payne neared a stop sign at a T-intersection onto a service road, Sergeant Moser—who was sitting in the passenger seat of the F-150—radioed the other detectives and directed them to "effect [Payne's] arrest" when Payne stopped. J.A. 102.

Detective Taormina immediately heeded Sergeant Moser's direction to initiate what is known in law enforcement parlance as a tactical vehicle intercept (TVI). A TVI is a "vehicle stopping technique . . . that utilizes a designed, coordinated, and intentional deployment of police vehicles intended to minimize the possibility of vehicle movement or escape and ultimately immobilize a suspect vehicle." Fairfax Cnty. Police Dep't,

4

General Order 505 (2025).[1] Detective Taormina maneuvered the F-150 truck in front of Payne's car, causing him to drive over the curb and on to the service road. Believing that someone was attempting to rob or kill him, Payne tried to get away from the potential assailants.

Payne had not driven more than seven or eight feet on the service road when Detective Stepp rammed into Payne's car from behind in a second unmarked vehicle. This is a law enforcement tactic known as a precision immobilization technique (PIT). A PIT is the "intentional act of using a police vehicle to physically force a fleeing vehicle from its course of travel to immobilize it." Fairfax Cnty. Police Dep't, General Order 505 (2025). The impact of the PIT caused Payne's car to spin out of control. Although his testimony on this point is somewhat murky, Payne consistently stated that he only noticed police lights and sirens sometime after his car was rammed. He had previously been unaware that the vehicles pursuing him belonged to law enforcement.

Payne attempted to maintain control of his car as it spun by keeping his left hand on the steering wheel. His right arm was completely immobilized in a cast and sling from a recent surgery. When the car came to a stop, Payne looked over his left shoulder to see what had happened but was blinded by the lights behind him. Unable to see anything, Payne turned back to face the front of the car. His left hand remained at his side.

---

[1] We take judicial notice of this definition pursuant to Federal Rule of Evidence 201(b)(1). *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 509 (4th Cir. 2015).

After Payne's car came to a stop, the detectives maneuvered their vehicles to block him from leaving the scene. Detective Taormina positioned his F-150 next to Payne's driver-side door, and Sergeant Moser got out. Because the windows of Payne's car were tinted, Sergeant Moser shined his flashlight through the driver-side passenger window to see what was happening inside.

Seconds later, Payne heard the sound of breaking glass and realized that he had been shot in his left arm. In the aftermath of the shooting, Payne heard the detectives shouting instructions at him, telling him to throw his gun out the window. Payne repeatedly told the detectives that he did not have a gun. Detectives shouted instructions at Payne telling him to raise his hands. Payne tried to tell the detectives that he could not move because his right arm was immobilized by the cast and sling and his left arm had been shot. Thinking he was going to die, Payne "closed [his] eyes and kind of tilted [his] head to the left and [ ] wait[ed] for [the detectives] to shoot." J.A. 312.

The detectives removed Payne from his car and performed first aid on the scene to treat the gunshot wound. They then took him to the hospital for further treatment. Payne's wound later became infected, requiring surgery.

Sergeant Moser's account of what transpired that night is largely consistent with Payne's. There are several important inconsistencies in their accounts, however. First, Sergeant Moser contends that the detectives first activated their police lights and sirens right *before* the detectives rammed into Payne's car, whereas Payne claims, however, that the detectives turned on their police lights and sirens only sometime *after* his car was

6

rammed.[2] Second, Sergeant Moser claims that the detectives only rammed Payne's car once, whereas Payne asserts that the detectives rammed his car multiple times. Third, with respect to the shooting, Sergeant Moser asserts that he "provided multiple verbal commands to [Payne] identifying [himself] as a police officer" before shooting Payne. J.A. 103. Payne claims to have not heard anything before he was shot. Fourth, Sergeant Moser also claims that, as he shined his flashlight into Payne's car, he saw Payne "look toward the center console and reach with his left hand down towards the center console and begin to rise back up again." J.A. 103–04. Payne contends that his arm remained at his side the entire time. Both parties agree that everything happened within a matter of moments.

Payne sued Sergeant Moser for excessive force in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983, and for gross negligence in violation of Virginia state law.[3] In his complaint, Payne alleges that Sergeant Moser used excessive force when he directed the use of TVI and PIT maneuvers, including the ramming of unmarked vehicles into Payne's car, and when he shot Payne. Sergeant Moser moved for summary judgment, which the district court granted.

---

[2] In addition to his own affidavit, Sergeant Moser relies upon affidavits from other detectives on the scene. The other detectives' accounts as to when they turned on their police lights and sirens vary. None contest, however, that they initiated the first maneuver, the TVI, before turning on their police lights or sirens.

[3] Payne also alleged that Sergeant Moser unreasonably searched him in violation of the Fourth Amendment. He withdrew this claim at oral argument. Oral Argument, at 1:09 [https://perma.cc/HDW5-2G6S].

In assessing the evidence, the district court did not address Payne's claim that the use of TVI and PIT maneuvers constituted excessive force. Instead, the district court ruled solely on the basis of the shooting. The district court concluded that there were no genuine disputes of material fact about the shooting. Based on the facts as described by the district court, it then concluded that Sergeant Moser reasonably interpreted Payne's movements in the car as his reaching for a weapon. Thus, the district court ruled that Sergeant Moser's use of force in response to this perceived threat was reasonable. Because the district court determined that Sergeant Moser's use of force was reasonable, it also dismissed Payne's state law gross negligence claim.[4] Payne timely appealed the district court's judgment, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.    Analysis

This court reviews a district court's grant of summary judgment *de novo*. *Milla v. Brown*, 109 F.4th 222, 227–28 (4th Cir. 2024). Summary judgment is appropriate only if there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law" and a genuine dispute exists where "the evidence is

---

[4] In its ruling, the district court lamented in a footnote that Payne's counsel had attached an entire deposition transcript as evidence in support of his opposition to summary judgment. Though we hold that summary judgment is not warranted here, we would be remiss if we did not address the difficulty faced by our district court colleague in ruling on this motion. We reiterate the importance in our system of justice of "vigorous representation" by counsel, *Penson v. Ohio*, 488 U.S. 75, 84 (1988), including in directing the district court to specific parts of the record for consideration at summary judgment.

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, we are obligated to view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). We may not "credit [the movant's contrary] evidence, weigh the evidence, or resolve factual disputes in the [movant's] favor," even if "a jury could well believe the evidence forecast by the [movant]." *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017).

Payne contests the district court's grant of summary judgment with respect to both his claim of excessive force and his gross negligence claim. Because the claims arise out of the same set of facts, we address them together. Upon review of the record evidence, we conclude that genuine disputes of material fact remain regarding whether Sergeant Moser used excessive force both when he directed the use of force to stop Payne's car and when he shot Payne. We also hold that, viewing the evidence in the light most favorable to Payne, Sergeant Moser's conduct was not objectively reasonable as a matter of law. Accordingly, we reverse and remand for further proceedings on both claims.

## A. Excessive Force

The Fourth Amendment protects against "unreasonable seizures." U.S. Const. amend. IV. Use of excessive force by law enforcement can render an otherwise valid seizure unreasonable. *Tennessee v. Garner*, 471 U.S. 1, 8 (1984). What constitutes excessive force for purposes of the Fourth Amendment depends "not only [on] when a

9

seizure is made, but also how it is carried out." *Id.* Law enforcement is not permitted to use excessive force when arresting a suspect even if probable cause for arrest exists. *Lewis v. Caraballo*, 98 F.4th 521, 531 (4th Cir. 2024).

The central inquiry of an excessive force claim is whether the officer's actions were objectively reasonable under the totality of the circumstances. *Benton v. Layton*, 139 F.4th 281, 289 (4th Cir. 2025). To evaluate the reasonableness of an officer's actions, we look to the information possessed by the officer at the moment that force was employed. *Culosi v. Bullock*, 596 F.3d 195, 201 (4th Cir. 2010). This inquiry reflects the reality that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). At the summary judgment stage, whether an officer's actions were objectively reasonable is a "question of pure law." *Henry*, 652 F.3d at 531; *see also Armstrong. v. Hutcheson*, 80 F.4th 508, 512–14 (4th Cir. 2023) (explaining this inquiry at the summary judgment stage). If, taking the facts in the light most favorable to the nonmovant plaintiff, the officer's actions were objectively reasonable, then the officer is entitled to judgment as a matter of law. *Graham*, 490 U.S. at 399. If there are genuine issues of material fact as to whether the officer's actions were objectively reasonable, summary judgment is not appropriate. *Lewis*, 98 F.4th at 532–34.

In *Graham v. Connor*, the Supreme Court articulated factors, now known as the *Graham* factors, to guide our inquiry into whether an officer's actions were objectively reasonable or may have constituted excessive force. 490 U.S. at 396. We first examine "the severity of the crime at issue." *Id.* Second, we evaluate if the individual "pose[d] an

10

immediate threat to the safety of the officers or others." *Id.* Third, we consider "whether the [individual was] actively resisting arrest or attempting to evade arrest by flight." *Id.* This determination "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016) (internal citation omitted).

Payne alleges that Sergeant Moser used excessive force both by directing the use of force to effect his arrest and by shooting him in the arm. Each constitutes a separate allegation of excessive force, and we consider each in turn.

### i.      *Directing the use of force to effect Payne's arrest*

As a threshold matter, we must determine whether Sergeant Moser's actions were objectively reasonable when he directed the detectives to effect Payne's arrest through the use of the TVI and PIT.[5] We note from the differing accounts of Payne and Sergeant Moser that there are a number of genuine disputes of material fact regarding this use of force. To what extent was Sergeant Moser responsible for the maneuvers? How many times did the detectives ram into Payne's car? At what point did the detectives turn on their police lights and sirens? When did Payne become aware that the unmarked vehicles following him

---

[5] Although Sergeant Moser was not himself driving any of the vehicles involved, Sergeant Moser directed the detectives to stop Payne's car and effectuate his arrest. J.A. 102 (Sergeant Moser's affidavit). Section 1983 "creates liability not just for a state actor who directly deprives a plaintiff of her rights, but one who 'causes' such a deprivation." *Amisi v. Brooks*, 93 F.4th 659, 670 (4th Cir. 2024) (quoting 42 U.S.C. § 1983) (internal emphasis omitted). In excessive force cases, we look to the "moment" the force is employed. *Id.* (internal citation omitted). In this case, Sergeant Moser directed the detectives' use of force the moment the force was employed.

11

belonged to law enforcement? These questions must be resolved by a finder of fact. At this stage, we resolve these disputes in the light most favorable to Payne and consider whether the use of force was objectively reasonable under the circumstances. If so, Sergeant Moser is entitled to judgment as a matter of law.

When law enforcement officers ram their vehicle into a suspect's car, they effect a seizure for purposes of the Fourth Amendment. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 381 (2007); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989). Payne was therefore seized from the moment the detectives carried out the TVI, rammed into Payne's car, and sent it into a tailspin. This court has further recognized that ramming a suspect's car can constitute deadly force in some instances because it can result in serious injury or death. *Abney v. Coe*, 493 F.3d 412, 418 (4th Cir. 2007). Applying the *Graham* factors, we must therefore consider the "proportionality of the force in light of all the circumstances" at the moment Sergeant Moser authorized the maneuvers to effect Payne's arrest. *Armstrong*, 810 F.3d at 899 (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015)).

The first *Graham* factor asks us to consider the severity of the crime. This factor is "intended as a proxy for determining whether 'an officer [had] any reason to believe that [the subject of a seizure] was a potentially dangerous individual.'" *Id.* at 900 (quoting *Smith*, 781 F.3d at 102). The record evidence supports the detectives' belief that they had probable cause to arrest Payne for possession of drugs with intent to sell—a felony offense—when he arrived at the location of the planned drug buy. The confidential informant had called Payne to purchase drugs and provided an address for the transaction. Payne arrived at the specified address at the agreed-upon time. The detectives also had

12

reason to believe that Payne would be armed, having been told repeatedly that Payne often carried a gun. This *Graham* factor weighs slightly in favor of Sergeant Moser. The nonviolent nature of this drug offense and the fact that Payne was attempting to leave the area at the time mitigate the severity of the crime. *See, e.g.*, *Smith*, 781 F.3d at 102 (emphasizing the "nonviolent" nature of the crime as part of the first factor of the *Graham* analysis).

The second *Graham* factor—whether the suspect posed an immediate threat to the safety of the detectives or others—weighs in favor of Payne. Among all the *Graham* factors, this is considered the most important. *Lewis*, 98 F.4th at 531. At the time that Sergeant Moser directed the detectives to use their vehicles to effect Payne's arrest, Payne was leaving the area. A reasonable jury could conclude that Payne posed no immediate threat to the detectives or to any other individual.

Cases upholding law enforcement's use of TVI and PIT maneuvers usually involve a high-speed pursuit with significant danger to the public. *See, e.g.*, *Scott*, 550 U.S. at 374–75 (involving a driver who repeatedly refused to pull over while leading officers on a high speed chase exceeding eighty five miles per hour prior to the officer ramming his car); *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 581 (5th Cir. 2009) (finding the ramming of a vehicle reasonable to stop recklessly-fleeing, intoxicated driver driving at speeds of ninety miles per hour on a two-lane road). Not so here. Payne was, by all accounts, driving slowly out of a shopping complex. He was driving neither quickly nor recklessly, nor was there any other apparent danger to pedestrians. In other circumstances, TVI or PIT

13

maneuvers may be reasonable. Given the totality of circumstances here, however, the second factor weighs in favor of Payne.

The third *Graham* factor asks us to consider whether the suspect was actively resisting arrest or attempting to evade arrest by flight at the time the alleged excessive force was used. This factor also favors Payne, viewing the evidence in the light most favorable to him. All of the detectives' vehicles were unmarked, black, and had tinted windows. The detectives did not activate their lights or sirens, nor did they attempt to pull Payne over, before they used the TVI and PIT maneuvers to stop him. Payne stated both in his interviews with detectives immediately following the incident and in his deposition that he feared someone was trying to rob or kill him. A reasonable jury could conclude that Payne was not aware that law enforcement was in the vicinity. By contrast, in cases where courts have found this use of force to be objectively reasonable, law enforcement rammed a suspect's car after detectives announced their presence, activated their police lights and sirens, and gave the suspect an opportunity to pull over first. *See, e.g.*, *Moore-Jones v. Quick*, 909 F.3d 983, 986 (8th Cir. 2018) (involving a suspect fleeing at high speeds and driving erratically after law enforcement attempted to pull over the individual); *Abney*, 493 F.3d at 416–17 (involving a driver who led the officer on a lengthy chase after he turned on his police lights and sirens).

Sergeant Moser argues that whether the police lights and sirens were activated is immaterial. He contends that law enforcement officers are not obligated to notify an individual before using objectively reasonable force. Regardless of whether such an obligation exists, law enforcement identification certainly can—and often does—play a

14

role in this court's analysis of whether an officer's use of force was objectively reasonable. *See, e.g.*, *Knibbs v. Momphard*, 30 F.4th 200, 216–17 (4th Cir. 2022) (finding that a genuine dispute of material fact as to whether the officer was "readily recognizable as a law enforcement officer" precluded summary judgment); *Sabbe v. Washington Cnty. Bd. of Commissioners*, 84 F.4th 807, 825 (9th Cir. 2023) (finding that the "officers' failure to warn or provide direction to [the suspect] before using potentially deadly force weighs against them" in the *Graham* analysis).

There are most certainly circumstances in which law enforcement's ramming of a suspect's car is objectively reasonable. For example, in *Scott v. Harris*, the Supreme Court held that it was reasonable to ram a suspect's car "to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders." 550 U.S. at 374. This court held in *Abney v. Coe* that an officer's ramming was objectively reasonable when the fleeing suspect was driving erratically at high speeds after an eight-mile pursuit because of the danger to public safety. 493 F.3d at 417–18. The circumstances here, however, differ significantly.

It is undisputed that the detectives were not engaged in a high-speed chase when they rammed Payne's car. Nor was Payne driving in a manner that threatened public safety. Rather, viewing the evidence in the light most favorable to Payne, Sergeant Moser directed the detectives to conduct the TVI and PIT maneuvers in unmarked police vehicles at night without first giving Payne an opportunity to pull over, particularly when he posed no apparent danger to bystanders. Having considered the *Graham* factors, we conclude that

15

such use of force was not objectively reasonable under these circumstances. Therefore, Sergeant Moser is not entitled to summary judgment as a matter of law.

#### ii.    The shooting

Next, viewing the evidence in the light most favorable to Payne, we consider whether it was objectively reasonable for Sergeant Moser to shoot Payne. Law enforcement's use of deadly force, including shooting a suspect, can be objectively reasonable when there is "probable cause to believe that [the suspect] poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. As we have stated, the reasonableness of an officer's actions is "determined by the information possessed by the officer at the moment the force is employed." *Culosi*, 596 F.3d at 201. If the officer's belief that the individual poses a serious threat is unreasonable, then the use of deadly force is unconstitutional. If, however, the officer's belief is reasonable at the time, then the use of force is within the bounds of the Constitution even if the officer was mistaken about the threat. *Franklin v. City of Charlotte*, 64 F.4th 519, 531 (4th Cir. 2023).

Importantly, the record contains undisputed evidence that Sergeant Moser was repeatedly told that Payne was likely armed. Payne argues that the detectives should have investigated the informant's claims further before relying on them. We disagree. The detectives' reliance on the informant's statements that Payne was likely armed was reasonable, albeit ultimately mistaken. Notably, the informant provided other information that proved accurate in setting up the controlled buy.

The fact that Sergeant Moser reasonably believed Payne was armed does not end our inquiry. Our court has long held that "simply being armed is not grounds for law

16

enforcement to employ deadly force, unless that person makes some sort of furtive or other threatening movement with the weapon." *Cooper v. Doyle*, 163 F.4th 64, 81 (4th Cir. 2025); *see also Knibbs*, 30 F.4th at 225 (holding that "failure to obey commands" by law enforcement does not justify the use of deadly force absent a furtive or threatening movement "signaling to the officer that the suspect intends to use [the weapon] in a way that imminently threatens the safety of the officer or another person"). Summary judgment is not, therefore, appropriate where a genuine dispute exists as to whether the plaintiff moved in a furtive or threatening manner. *Aleman v. City of Charlotte*, 80 F.4th 264, 293–94 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 1032 (2024).

*Aleman* is instructive. In *Aleman*, this court reversed a grant of summary judgment because of a genuine dispute as to whether a man experiencing a mental health crisis had made a furtive or threatening movement with his gun before an officer shot him. *Id.* at 291–93. As in *Aleman*, we conclude that there is a genuine factual dispute over whether Payne moved furtively. Payne contends that he kept his left hand on the steering wheel at all times as his car spun to a stop, had his left arm by his side on the armrest at the moment that Sergeant Moser shot him, and that he never reached toward the center console. Sergeant Moser contends, on the other hand, that he saw Payne reach toward the center console. This is not a "minor discrepanc[y.]" *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) (finding that minor discrepancies in the account did not create a material issue of fact where the evidence conclusively established that the officer reasonably perceived the man to be armed with a gun). Because there is no video footage from that night to corroborate or rebut either version of the facts, we are left with conflicting testimony from Payne and Sergeant

17

Moser. At summary judgment, we do not make credibility determinations. *Knibbs*, 30 F.4th at 213. A plaintiff's firsthand account may only be discounted "'[1] when there is evidence . . . of undisputed authenticity that [2] shows some material element of the plaintiff's account to be *blatantly and demonstrably* false' [3] such 'that no reasonable jury could' credit the plaintiff's version of events." *Alexander v. Connor*, 105 F.4th 174, 179 (4th Cir. 2024) (quoting *Harris v. Pittman*, 927 F.3d 266, 276 (4th Cir. 2019) and *Scott*, 550 U.S. at 380) (emphasis in original). We have no such evidence in front of us. Summary judgment is, therefore, not appropriate.

## B. Qualified Immunity

Law enforcement may nonetheless be shielded from civil liability for the use of excessive force "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Benton*, 139 F.4th at 288 (quoting *Brown v. Elliott*, 876 F.3d 637, 641 (4th Cir. 2017)). Qualified immunity is an affirmative defense to liability where a defendant "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Case v. Beasley*, 167 F.4th 651, 662 (4th Cir. 2026) (quoting *Taylor v. Riojas*, 592 U.S. 7, 8 (2020)). We reiterate that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *accord Gooden v. Howard Cnty.*, 954 F.2d 960, 965 (4th Cir. 1992) (en banc); *Barricks v. Wright*, 168 F.4th 210, 216 (4th Cir. 2026); *Putman v. Harris*, 66 F.4th 181, 187 (4th Cir. 2023). The district court did

18

not reach the issue of qualified immunity because it concluded that no constitutional violation occurred. Upon remand, therefore, the district court will need to consider—in the first instance—whether Sergeant Moser is entitled to qualified immunity for either of Payne's asserted claims of excessive force.

### III.    Conclusion

"It is not lost on us that we issue this decision from the calm of a courthouse." *Aleman*, 80 F.4th at 269 (quoting *Franklin*, 64 F.4th at 539). We are mindful that police officers are sometimes forced to make split second decisions that can mean the difference between life or death for themselves and their fellow officers. Such considerations cannot, however, excuse the use of excessive force in violation of the Fourth Amendment. For the reasons stated above, we vacate the grant of summary judgment to Sergeant Moser and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*