**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 25-1058**

─────────────

MARGARET P. BYERS, Co-administrator of the Estate of Charles M. Byers, Deceased; MICHAEL C. BYERS, Co-administrator of the Estate of Charles M. Byers, Deceased

       Plaintiffs – Appellees,

v.

GORDON J. PAINTER

       Defendant – Appellant,

and

CITY OF RICHMOND; CHIPPENHAM & JOHNSTON-WILLIS HOSPITALS, INC., a subsidiary of HCA Healthcare, Inc.; STEVEN M. GIBSON; DAVID R. HYDE, JR.; JOHN/JANE DOE SECURITY GUARDS (1-5); COUNTY OF CHESTERFIELD

       Defendants.

─────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Roderick C. Young, District Judge. (3:23-cv-00801-RCY)

─────────────

Argued: September 26, 2025            Decided: April 17, 2026

─────────────

Before DIAZ, Chief Judge, GREGORY, Circuit Judge, and KEENAN, Senior Circuit Judge.

─────────────

Affirmed by published opinion. Senior Judge Keenan wrote the opinion, in which Judge Gregory joined. Chief Judge Diaz wrote a dissenting opinion.

─────────────

**ARGUED:** Julie A. C. Seyfarth, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF CHESTERFIELD, Chesterfield, Virginia, for Appellant. Paul McCourt Curley, SIX EAST LAW GROUP – CURLEY LAW FIRM, PLLC, Richmond, Virginia, for Appellees. **ON BRIEF:** Jeffrey L. Mincks, Andrew J. Fulwider, COUNTY ATTORNEY'S OFFICE FOR THE COUNTY OF CHESTERFIELD, Chesterfield, Virginia, for Appellant.

---

BARBARA MILANO KEENAN, Senior Circuit Judge:

Charles Byers was shot and killed during an encounter with defendant Corporal Gordon Painter, a Chesterfield County police officer (Officer Painter). The incident occurred while Officer Painter was responding to an emergency call that Byers had attempted to break into two homes and had vandalized one of those homes.

Byers' parents (the plaintiffs) filed suit under 42 U.S.C. § 1983 against Officer Painter, alleging excessive force in violation of the Fourth Amendment. Officer Painter moved to dismiss the plaintiffs' complaint on qualified immunity grounds. The district court denied the motion, holding that Officer Painter was not entitled to qualified immunity, because Byers did not pose a threat to the officers or to others in the moments immediately before he was shot. Officer Painter now appeals from the district court's decision.

While this appeal was pending, the Supreme Court held that in determining whether an officer's use of deadly force was reasonable under the Fourth Amendment, a court must not limit its inquiry to the moments immediately prior to the use of deadly force. *See Barnes v. Felix*, 605 U.S. 73, 80–83 (2025). Instead, courts must consider the "totality of the circumstances" in assessing the reasonableness of the officer's actions. *Id.* at 76. Although the district court did not have the benefit of the decision in *Barnes* and, thus, erred in limiting its inquiry to the moments immediately before Byers was shot, we still affirm the district court's determination that Officer Painter is not entitled to qualified immunity. Based on our de novo consideration of the totality of the circumstances, we conclude that Officer Painter's use of deadly force was unreasonable, and that the Fourth

3

Amendment violation was clearly established law at the time of the incident. We therefore affirm the district court's denial of Officer Painter's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

## I.

"We review de novo the denial of a motion to dismiss based on qualified immunity."[1] *Burns-Fisher v. Romero-Lehrer*, 57 F.4th 421, 424 (4th Cir. 2023) (quoting *Evans v. Chalmers*, 703 F.3d 636, 646 (4th Cir. 2012)). We emphasize that a court's role in considering a motion to dismiss under Rule 12(b)(6) is to evaluate the sufficiency of the complaint and that a court is not permitted at this stage to resolve factual disputes. *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024). Instead, we must accept the facts alleged as true and draw all reasonable inferences from those facts in favor of the plaintiffs. *Id.*; *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). In evaluating the plaintiffs' complaint, we also consider the police body camera video attached to the complaint and referenced by both parties in their arguments. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). We construe the video as consistent with the complaint unless it "blatantly contradicts the plaintiff[s'] allegations." *Doriety*, 109 F.4th at 679–80.

---

[1] We are satisfied that we have jurisdiction to review Officer Painter's appeal pursuant to the collateral order doctrine. *Atkinson v. Godfrey*, 100 F.4th 498, 503 (4th Cir. 2024) ("Under the collateral order doctrine, when a district court denies a motion to dismiss that is based on qualified immunity, . . . the action is a final order reviewable by this court to the extent it turns on an issue of law." (citation omitted) (alterations omitted)).

4

According to the plaintiffs' complaint, Charles Byers suffered from a schizoaffective disorder. He was hospitalized numerous times for his condition between 2008 and 2022. On July 5, 2023, Byers' mother drove him to HCA-Chippenham Hospital seeking treatment for his worsening symptoms. Byers was evaluated by a clinical social worker, who recommended that he be placed under a temporary detention order.[2] A local magistrate issued the temporary detention order the following day.

Byers soon was transferred to the City of Richmond jail and, despite the detention order, was released. At some point after his release, Byers walked about fourteen miles from the jail to his parents' neighborhood in Chesterfield County. Unable to find his parents' home, Byers allegedly "wandered around" nearby neighborhoods for hours. Joint Appendix (J.A.) 61.

Around noon on July 8, 2023, the Chesterfield County Police Department "received a 911 call . . . that [Byers] had attempted to enter" the caller's home. *Id.* The caller "reported that [Byers] tried opening a neighbor's door, was talking to a neighbor and then entered another neighbor's garage." *Id.* The dispatcher relayed to officers on duty that "there had been an attempted breaking and entering and vandalism" at a home in Chesterfield County. *Id.*

An officer arrived at the scene and observed Byers standing in a driveway of a different home. Byers was barefoot and was holding a hatchet at his side below his waist.

---

[2] Virginia Code § 37.2-809(B) provides for the issuance of a temporary detention order when a patient "lack[s] capacity to protect himself from harm or to provide for his basic human needs."

The officer got out of her car, drew her gun, and repeatedly ordered Byers to drop the weapon. Officer Painter arrived in a separate vehicle and pulled his vehicle in front of Byers. After getting out of his vehicle, Officer Painter immediately drew his gun and ordered Byers to put down the hatchet. Byers ignored both officers' commands.

Byers crossed through the home's front yard, moving momentarily toward Officer Painter. Byers then walked into the street and, while facing the officers, began to back away. Byers asked Officer Painter, "[y]ou got a big ass handgun?" He repeated, "[y]ou got a big enough gun?" J.A. 159. Painter responded, "Yeah, come on. Put [the hatchet] down." *Id.*

The first officer on the scene stated, "I'll take less lethal," and pulled out her taser. J.A. 160. Officer Painter twice instructed the other officer to "go ahead and tase him." *Id.* She repeated her command to drop the weapon and, when Byers did not respond, she fired the taser. It is unclear whether the taser hit Byers, but Byers remained standing facing the officers and continued backing away from them.

Officer Painter told Byers to drop the hatchet two more times. Byers refused, telling the officers twice to "come get it." *Id.* After the second remark, Byers, who was now about 25 feet away from the officers, turned his head to look over his shoulder. While Byers was looking away from the officers, Officer Painter fired three gunshots at Byers, who still was standing around 25 feet away.

After the initial shots, Byers turned his back to the officers and began to run down the street away from the officers. Officer Painter fired three or four additional gunshots, hitting Byers in the back. Byers ran several more yards and fell to the ground, where he

6

was placed in handcuffs. The entire encounter lasted less than two minutes. Byers died shortly thereafter. The plaintiffs contend that the bullets from the final shots, which lodged in Byers' back, were fatal.

Throughout the entire interaction, the hatchet remained at Byers' side. Neither the allegations in the complaint nor the body camera video indicates that Byers ever moved toward the officers with the hatchet once he began backing away from them. Similarly, neither the allegations nor the video suggests that Byers took any action to throw the hatchet at the officers or to use it in another threatening manner.

In July 2024, Byers' parents filed an amended complaint asserting two claims against Officer Painter: (1) a claim under 42 U.S.C. § 1983 for excessive force, in violation of the Fourth and Fourteenth Amendments, and (2) a claim for negligence under Virginia common law.[3] Officer Painter filed a motion to dismiss, asserting qualified immunity from suit. In January 2025, the district court issued an opinion, denying the motion to dismiss on the Section 1983 claim, and granting the motion to dismiss on the negligence claim. As relevant to the present appeal, the district court concluded that Officer Painter was not entitled to qualified immunity.

II.

---

[3] The plaintiffs also asserted claims against the City of Richmond, Chippenham & Johnston-Willis Hospitals, Steven M. Gibson, David R. Hyde Jr., John/Jane Doe Security Guards (1–5), County of Chesterfield and Chesterfield County Police Department. These defendants are not parties to this appeal.

The doctrine of qualified immunity "balances two important interests," namely, the need to hold accountable public officials who exercise power irresponsibly, and the need to shield officials who perform their duties responsibly from "harassment, distraction, and liability." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The burden of establishing qualified immunity rests on the party seeking the shield of that immunity. *Id.*

In considering whether Officer Painter was entitled to qualified immunity, we conduct a two-step inquiry. We first consider whether the facts as alleged establish that Officer Painter's conduct violated Byers' right under the Fourth Amendment to be free from the use of excessive force. *Benton v. Layton*, 139 F.4th 281, 288 (4th Cir. 2025); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). And second, we determine whether the Fourth Amendment right at issue was "clearly established" at the time of the officer's conduct. *Benton*, 139 F.4th at 288; *Saucier*, 533 U.S. at 201. Accordingly, Officer Painter was entitled to qualified immunity if he showed either: (1) that the alleged constitutional violation did not occur, or (2) that any such violation was not "clearly established" at the time the incident occurred. *See Aleman v. City of Charlotte*, 80 F.4th 264, 284–85 (4th Cir. 2023).

Officer Painter challenges both elements of the district court's qualified immunity determination. First, Officer Painter contends that the court failed to consider the totality of the circumstances in assessing the reasonableness of the use of deadly force. Applying that standard, Officer Painter asserts that the totality of the circumstances shows that Byers posed an immediate threat to the officers and to others, justifying the use of deadly force. According to Officer Painter, Byers posed an immediate threat to the officers because he

8

was armed with a hatchet, disregarded several commands to drop the weapon, and raised the hatchet while "challenging" the police to "come get" the weapon. Officer Painter also argues that Byers was a threat to bystanders based on his earlier attempts to enter two homes and the presence of people "nearby" the encounter. Officer Painter thus contends that the district court erred in concluding that he violated Byers' rights under the Fourth Amendment.

Officer Painter alternatively argues that even if his use of force was unreasonable, he still is entitled to qualified immunity because the constitutional violation was not clearly established at the time he used deadly force against Byers. According to Officer Painter, this Court's precedent was insufficient to put a reasonable officer on notice that using deadly force in the circumstances presented would be unlawful. Instead, Officer Painter contends that our decisions make clear that he was faced with "immediate danger," particularly because Byers had "raised and lowered" the hatchet. We address these arguments in turn.

## A.

"The Fourth Amendment prohibits police officers from using excessive or unreasonable force" against an individual. *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 219 (4th Cir. 2018); *Graham v. Connor*, 490 U.S. 386, 395 (1989). We evaluate whether an officer has used excessive force based on a standard of "objective reasonableness." *Wilson*, 893 F.3d at 219; *Graham*, 490 U.S. at 388. Under this standard, the reasonableness of a particular use of force, deadly or not, "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Aleman*,

9

80 F.4th at 285 (quoting *Graham*, 490 U.S. at 396). The use of deadly force is reasonable only when a "suspect poses a threat of serious physical harm, either to the officer[s] or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

Here, consistent with this Court's precedent at the time, the district court focused its reasonableness analysis "on the moment that deadly force was used, not the whole episode." *See Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). In its analysis, the district court highlighted the following allegations: (1) that when Officer Painter fired his weapon, Byers was "at least 25 feet away" from the officers with his "head . . . turned away" from them; (2) that Byers had not made "any furtive or otherwise threatening gestures;" and (3) that the fatal shots struck Byers in the back as he began to run away from the officers. J.A. 146. Based on its consideration of these alleged circumstances, the district court held that Byers did not pose an immediate threat to the officers or to others and that, therefore, Officer Painter was not entitled to qualified immunity at the motion-to-dismiss stage of the proceedings.

As noted above, while this appeal was pending, the Supreme Court issued its opinion in *Barnes v. Felix*, holding that "a court cannot . . . 'narrow' the totality-of-the-circumstances inquiry, to focus on only a single moment. It must look too, in [deadly force cases] and all excessive-force cases, at any relevant events coming before." 605 U.S. at 73. We applied this standard announced in our recent decision in *Benton v. Layton*, 139 F.4th at 289. There, we used factors from *Graham v. Connor*, 490 U.S. at 396, to evaluate the "totality of the circumstances" in assessing the reasonableness of the use of deadly force. *Benton*, 139 F.4th at 289–93. Because the district court in the present case did not

have the benefit of *Barnes* and *Benton* when it denied Officer Painter's motion to dismiss, we conclude that the court applied an improper standard in its Fourth Amendment reasonableness analysis.[4]

We review de novo the district court's conclusion that Officer Painter failed to establish at the motion-to-dismiss stage that he was entitled to qualified immunity. *Burns-Fisher*, 57 F.4th at 424. Consistent with the holdings in *Barnes* and *Benton*, we consider whether, under the totality of the circumstances, Officer Painter established at this stage of the proceedings that his use of deadly force was reasonable under the Fourth Amendment. As explained below, we hold that, considering the full encounter as alleged in the plaintiffs' complaint and as shown in the body camera video, the district court reached the correct result in concluding at this stage of the proceedings that Officer Painter failed to establish a right to qualified immunity. *See United States v. Patterson*, 278 F.3d 315, 317 (4th Cir. 2002) ("[W]e may affirm the court's order on any ground supported by the record even if it is not the basis relied upon by the district court." (citation omitted)).

We are guided by the *Graham* factors in evaluating the totality of the circumstances to determine whether Officer Painter's use of force was objectively reasonable. *See Benton*, 139 F.4th at 289. Those factors include: (1) the "severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight."

---

[4] *United States v. Carolina Transformer Co.*, 978 F.2d 832, 836 n.3 (4th Cir. 1992) ("We apply the law as it exists at the time of our decision.").

11

*Graham*, 490 U.S. at 396.[5]  We consider the second factor "particularly important." *Caraway v. City of Pineville*, 111 F.4th 369, 382 (4th Cir. 2024) (quoting *Franklin v. City of Charlotte,* 64 F.4th 519, 531 (4th Cir. 2023)); *see also Lewis v. Caraballo*, 98 F.4th 521, 531 (4th Cir. 2024) (referring to the second factor as the "most important" *Graham* factor). Critically, these factors "are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure."  *Lewis*, 98 F.4th at 531 (citation omitted).

We conclude that the first *Graham* factor, severity of the crime, weighs in favor of Officer Painter.  *See Graham*, 490 U.S. at 396.  The plaintiffs allege that the police dispatcher relayed to the officers that there had "been an attempted breaking and entering and vandalism."  J.A. 61.  The plaintiffs also allege that when the officers arrived at the scene, they saw Byers standing near a residential garage holding a hatchet.  Notably, the officers had not received any indication that Byers had threatened or had attempted to harm anyone.  Nonetheless, the officers were aware that Byers had attempted to enter two residences and was observed holding a weapon on the private property of a third party. Based on these facts, we conclude that a reasonable officer confronted with this information would have understood that the severity of the reported crime was high.  *See Rambert v. City of Greenville*, 107 F.4th 388, 400 (4th Cir. 2024) (explaining that a reported

---

[5] We also have considered a fourth factor: "the extent of the [suspect's] injuries." *Caraway*, 111 F.4th at 382 n.12 (citation omitted).  This factor plainly weighs in favor of the plaintiffs, as Byers died as a result of Officer Painter's use of force.

12

breaking-and-entering after the homeowner heard glass break, suggesting a weapon was used, was a dangerous crime).

The second and most important *Graham* factor strongly favors the plaintiffs. This factor asks whether a reasonable officer would have perceived Byers to be "an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396; *Lewis*, 98 F.4th at 531. Taking the facts as alleged and as shown in the body camera video, we conclude that Byers did not pose "an immediate threat" to the officers or to others.

This Court has made clear that a suspect does not pose an immediate threat justifying the use of deadly force when the suspect merely possessed, or was suspected of possessing, a weapon and did not obey commands given by officers at the scene. *See Franklin*, 64 F.4th at 531. However, in such circumstances, an officer can use deadly force when the suspect "makes some sort of furtive or other threatening movement with the weapon." *Id.* (quoting *Knibbs v. Momphard*, 30 F.4th 200, 225 (4th Cir. 2022)). Here, it is undisputed that Byers possessed a weapon, the hatchet, and ignored the officers' numerous commands to drop the weapon. But there is no allegation in the complaint or indication in the video that Byers' conduct signaled to the officers that he intended to use the hatchet in a way that "imminently threaten[ed] the safety of the officer or another person." *Aleman*, 80 F.4th at 286–87 (quoting *Knibbs*, 30 F.4th at 225).

As shown in the video, Byers kept the hatchet lowered at his waist throughout the encounter and never made any movement suggesting that he intended to use the hatchet or to throw it at the officers. Although Byers stated twice that the officers should "come get [the hatchet]," those statements, spoken from a distance of about 25 feet without any

13

accompanying movement or furtive gesture toward the officers, were insufficient to constitute an immediate threat to the officers' safety.

Moreover, as alleged and as shown in the video, instead of advancing toward the officers, Byers attempted to distance himself from the officers throughout the encounter. When Officer Painter arrived on the scene, Byers angled his body away from the officers and walked through the front yard of a residence, resulting in a greater distance between Byers and the officers. And after Byers entered the street, he began backing away from the officers while facing them. When one of the officers fired a taser at Byers, he continued to back away. By the time Officer Painter began firing his handgun, Byers was "at least 25 feet away" from Officer Painter with his head "turned away" from the officers. J.A. 62. Given that distance, and the absence of any preceding furtive or threatening movements, we conclude that Byers did not pose an immediate threat to the officers.

We further observe that after Officer Painter fired the initial three shots, Byers turned and began to run away from the officers. So, at that point, when Officer Painter shot Byers an additional three or four times, Byers was no longer facing the officers and was not in a position to throw the hatchet at the officers, to charge at them, or otherwise to physically threaten them.

Neither the allegations nor the video shows that Byers posed any immediate threat to others at the scene of the shooting. Although the encounter took place in a residential neighborhood, there are no allegations in the complaint regarding the presence of bystanders. And, in the body camera video, the only bystander visible before the shooting appears to be *behind* the officers and not close enough to be considered in immediate

14

danger.[6]  Moreover, Byers was moving in his bare feet and did not have access to a vehicle or to other means of quickly approaching neighborhood residents.

Viewed through the proper lens at the motion-to-dismiss stage, *see Doriety*, 109 F.4th at 679-80, the materials before us show that Byers did not pose an immediate threat to others when Officer Painter shot him multiple times.  In *Doriety,* we emphasized that a court considering a video at the motion-to-dismiss stage must credit the plaintiffs' version of the facts to the extent that they are not "blatantly contradicted" by the video recording. 109 F.4th at 679.  We explained that this is a "very difficult" standard to satisfy, requiring that the plaintiffs' version of events be "utterly discredited" by the video recording.  *Id.* (citation omitted).  This difficult standard has not been met here.

Finally, we consider the third *Graham* factor, namely, whether Byers resisted arrest or attempted to evade arrest.  *See* 490 U.S. at 396.  Resolution of this factor also favors the plaintiffs.  In assessing this third *Graham* factor, we have held that an officer's use of force must be "commensurate with the suspect's level of contemporaneous, active resistance." *Lewis*, 98 F.4th at 533 (quoting *Joseph ex. rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 335–36 (5th Cir. 2020)) (holding that use of force unreasonable when officer repeatedly

---

[6] The dissent refers to gathering bystanders, Dissent at 28, but they did not appear in the video until *after* Officer Painter shot Byers and are gathered some distance *behind* the officers.  And, although the video shows that there was an intersection visible in the distance behind Byers, that intersection was not part of the general area in which the shooting occurred.  Because the video does not "blatantly contradict" the plaintiffs' allegations that Byers did not pose a danger to the officers or to others, we must construe the facts at the motion-to-dismiss stage in favor of the plaintiffs and leave the resolution of those issues for later determination.  *See Doriety*, 109 F.4th at 679–80.

15

struck a resisting suspect in the head while he was lying on the ground); *see Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 901 (4th Cir. 2016) ("[T]he level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." (citation omitted)).

Here, although Byers continued to walk away from the officers, the officers never ordered Byers to stop. Moreover, Byers backed slowly away from officers throughout the encounter and did not try to run until *after* Officer Painter shot him three times.[7]  This encounter is not the kind of dangerous chase or active resistance that this Court has previously held justified the use of deadly force. *See Benton*, 139 F.4th at 292 (addressing the third *Graham* factor and explaining that deadly force was reasonable where suspect led officers on a high-speed chase to evade arrest); *Caraway*, 111 F.4th at 384 (explaining that suspect was disobeying officer who reasonably believed that suspect was pulling a gun to resist arrest).

We additionally observe that Byers' failure to heed commands to drop the hatchet did not render his conduct "resistance" in this context. We have held that merely ignoring commands is not the same as resisting arrest.  *See e.g., Wilson*, 893 F.3d at 217, 220 (concluding that a suspect was not resisting arrest even though he refused to drop an open pocketknife). Although Byers ignored the officers' commands, he never raised the hatchet, advanced toward the officers, or otherwise physically threatened them or endangered

---

[7] Officer Painter also argues that use of deadly force was justified because Byers ran after he was shot. This argument is unpersuasive. The fact that Byers ran *after* Officer Painter shot him cannot be used to justify the deadly force, because Officer Painter had already deployed the deadly force.

16

others.[8]  No reasonable officer would think that shooting a man in these circumstances, including shooting him in the back after he had begun to turn away from the officers, was proportionate to the minimal resistance Byers gave.

Accordingly, two of the three *Graham* factors, including most notably the second factor, weigh in favor of the plaintiffs.  So, we conclude that the plaintiffs have plausibly alleged that Officer Painter's use of force was not "objectively reasonable" and violated the Fourth Amendment.  *See Graham*, 490 U.S. at 395.

B.

We next consider Officer Painter's alternative argument that he still is entitled to qualified immunity because the constitutional violation that occurred was not clearly established at the time of the shooting.  A right is "clearly established" if it would be clear to a reasonable officer that the alleged conduct is unlawful.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982). To support a denial of qualified immunity, the contours of the constitutional right must be "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in the original) (citation omitted); *see Lewis*, 98 F.4th at 534.  To

---

[8] According to the dissent, "the video shows that Byers slightly raised the hatchet so that the blade faced the officers."  Dissent at 35.  But this statement by the dissent construes ambiguity in the video in favor of Officer Painter, rather than considering the facts alleged as true and drawing all reasonable inferences from those facts in the plaintiffs' favor.  *See Doriety*, 109 F.4th at 679.  As noted above, the degree to which Byers posed a threat to the officers or to others is a matter to be resolved at a later stage of these proceedings.  Here, at the motion-to-dismiss stage in which we consider the plaintiffs' allegations and the video, it is sufficient that the video does not "blatantly contradict[] the plaintiff[s'] allegations."  *Id.* at 679–80.

17

determine whether a violation of a right is clearly established, we assess whether the law is "settled," meaning that "it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation omitted); *see Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (explaining that controlling authority derives from decisions by the Supreme Court, this Court, or "the highest court of the state").

A constitutional right need not be recognized in an identical factual context before such right may be considered "clearly established" for purposes of qualified immunity. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Buonocore v. Harris*, 65 F.3d 347, 356–57 (4th Cir. 1995). However, the Supreme Court has emphasized in recent years that courts should be careful "not to define clearly established law at a high level of generality," and that "specificity is especially important in the Fourth Amendment context." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citations omitted). Thus, although we have looked to the general rules articulated in *Graham* and *Garner* in holding that a right is clearly established, *see, e.g.*, *Clem v. Corbeau*, 284 F.3d 543, 553–54 (4th Cir. 2002), the Supreme Court has cautioned that we should do so only in "obvious" cases exhibiting violations of the core of the Fourth Amendment, *Kisela*, 584 U.S. at 105–06 (citation omitted).

Here, Officer Painter argues that, at the time of the shooting, there was no binding caselaw advising an officer that he was prohibited from using deadly force against "a felony suspect armed with a large, bladed weapon who disregards numerous commands and raises and lowers the weapon while verbally challenging the police." Opening Br. at 34. Also, he argues that *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) and *Sigman v. Town*

18

*of Chapel Hill*, 161 F.3d 782, 787 (4th Cir. 1998) establish that his conduct was "objectively reasonable." We disagree with Officer Painter's arguments.

As an initial matter, Officer Painter's argument relies on his assertion that the body camera video shows Byers raising and lowering the hatchet in a threatening manner. However, contrary to Officer Painter's contention, the video does not clearly depict Byers deploying the hatchet in such a manner. At most, it shows that Byers tilted the blade slightly upward as he backed away from the officers. Thus, the video does not "blatantly contradict" the plaintiffs' allegations that Byers "was not a threat to Officer Painter or anyone else." J.A. 62–63. *See Doriety*, 109 F.4th at 679. And we reject Officer Painter's request that we consider a "still image" in his appellate brief purportedly derived from the video to show that the hatchet was "raised" at one point. Oral Arg. at 37:45–38:00, *Byers v. Painter*, Case No. 25-1058, https://perma.cc/Q7VY-FMUQ. That "still image" was not relied upon by the district court at the motion-to-dismiss stage, nor could it be. [9] Also, as previously explained, we reject Officer Painter's assertion that Byers' statements to "come get" the hatchet constituted an immediate threat to the officers, because the statements were made while Byers stood about 25 feet away from the officers and were not accompanied by any aggressive or furtive movements.

---

[9] This still image was not appended to the complaint and was not relied upon by the district court. Therefore, we do not consider the image here. *See Doriety*, 109 F.4th at 678 n.5 (explaining that this Court refused to consider on appeal "still images" from a body camera video not considered by the district court when denying an officer's motion to dismiss on qualified immunity grounds). By including the image in his appellate brief, Officer Painter impermissibly seeks to submit evidence at the motion-to-dismiss stage.

Accordingly, in determining whether Officer Painter is entitled to qualified immunity, we consider whether the law was clearly established in July 2023 that it was unreasonable for an officer to use deadly force against a suspect accused of the serious, but non-violent, crime of attempted breaking and entering who possessed a deadly weapon in plain view and disregarded several commands to drop the weapon, but did not make any threatening or furtive movements with the weapon toward the officers or others. Upon review, we conclude that this Court's decision in *Hensley v. Price*, 876 F.3d 573 (4th Cir. 2017) clearly established that an officer shooting an individual under these circumstances violates the Fourth Amendment.

In *Hensley*, officers responded to a report of a domestic altercation at Hensley's residence. *Id.* at 578. When the officers arrived, Hensley, who had struck his daughter in the officers' presence and was holding a handgun with its muzzle pointed at the ground, turned and began walking toward the deputies. *Id*. As Hensley approached, the officers shot and killed him. *Id.* When the officers fired on Hensley, his physical conflict with his daughter had ended. *Id.*

We held that a reasonable jury could conclude that the officers' use of force was unreasonable because Hensley "never raised the gun to the officers, and because he never otherwise threatened them." *Id*. at 583. We have made clear that "an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon" at a location where police have arrived to investigate reported criminal activity. *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013).

20

We elaborated on our decision in *Hensley* in the case of *Knibbs v. Momphard*, 30 F.4th 200. There, an officer responded to a report of an altercation between neighbors and observed a suspect in his home holding a shotgun that was not aimed at the officer. *Id.* at 207–09. After the suspect ignored the officer's multiple commands to drop the gun, the officer shot the suspect. *Id.* at 209–10. We held that this use of deadly force was unreasonable because the suspect had not threatened the officer with the weapon. *Id.* at 222–23. We stated that our precedent,

> clearly establish[es] that the failure to obey commands by a person in possession of, or suspected to be in possession of, a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person.

*Id.* at 225*; see Franklin*, 64 F.4th at 531.

Thus, our case law in effect at the time of the shooting plainly prohibited Officer Painter's conduct. Byers held a deadly weapon and ignored the officers' repeated commands to drop the weapon. But Byers did not make a threatening or furtive movement with the weapon in the direction of the officers or of anyone else. Rather, as in *Hensley*, Byers kept his weapon lowered throughout the encounter. In the absence of any threatening or furtive movement with the weapon, our precedent clearly established that it was unreasonable for Officer Painter to use deadly force against Byers.

We note that Byers, unlike Hensley, held a hatchet instead of a firearm, and told the officers to "come get it." However, these facts do not change our finding that *Hensley* clearly established that the use of force against Byers was unreasonable. Byers' statement

21

to the officers did not precede, coincide with, or follow any threatening or furtive movement with the hatchet. Moreover, the fact that Byers possessed a hatchet, which is less dangerous at 25 feet than a firearm, should have indicated to Officer Painter that Byers was *less* of a threat than the situations presented in *Hensley* and *Knibbs*.

Additionally, the fact that Byers was suspected of attempted breaking and entering, a serious, but non-violent, crime does not alter our analysis. Our precedent at the time of the incident clearly established that the use of deadly force is not reasonable, even when an armed suspect is accused of breaking and entering and assault, if the suspect does not make a threatening motion with the weapon. *See Wilson*, 893 F.3d at 219–21 (holding that use of deadly force by an officer was unreasonable when the plaintiff was suspected of breaking and entering and violently assaulting his ex-girlfriend and ignored commands to drop an open pocketknife). And the unreasonableness of Officer Painter's action is particularly evident because the officers did not confront Byers while the attempted burglary offenses were ongoing. If the officers had been engaged in efforts to interrupt the commission of a serious crime, the circumstances necessarily would have heightened the degree of danger to the officers. *Compare Wilson*, 893 F.3d 213 (holding use of deadly force unreasonable when plaintiff was suspected of a completed breaking and entering) *with Rambert*, 107 F.4th 388 (holding use of deadly force reasonable, in part, because the deceased was suspected of an "in-progress breaking-and-entering").

Our conclusion also does not change after considering Officer Painter's reliance on *Kisela* and *Sigman*. Those decisions particularly highlight the importance in our precedent of "threatening" movements. In *Sigman*, this Court affirmed the grant of qualified

22

immunity when an officer fatally shot a man, who, like Byers, was holding a bladed weapon and was ignoring officers' commands to drop the weapon. 161 F.3d at 788. However, unlike Byers, the suspect in *Sigman* had verbally threatened to kill his wife and the officers, had thrown objects and swung his knife at officers, and was moving toward the officers when he was shot. *Id.* at 784–85, 787.

Similarly, in *Kisela*, the Supreme Court, declining to address whether the officer's use of force was reasonable, concluded that it was not clearly established that an officer had used excessive force when he shot a woman who was holding a knife and behaving erratically. 584 U.S. at 103, 105–06. Critically, the Supreme Court emphasized that the woman had been seen swinging the knife and "had moved to within a few feet of" a bystander." *Id.* at 105. Here, Byers was not swinging the hatchet or moving it in a threatening manner, and he was not standing near others at the time that Officer Painter shot him.

Additionally, we address as a separate matter the final, multiple shots that hit Byers in the back as he fled, shots that allegedly caused his death. We hold that these shots present the "obvious case" in which an officer violates a clearly established right. *See Kisela*, 584 U.S. at 105. In *Garner*, the Supreme Court held that when "the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." 471 U.S. at 11. Here, there are no allegations and nothing shown by the body camera video that would have led a reasonable officer to believe that Byers posed an immediate threat to the officers or to others once he was hit by the initial shots, turned, and ran.

23

We find it notable that there are no cases in this Circuit in which we have granted qualified immunity to an officer who shot a fleeing suspect in the back in circumstances like those alleged here. This is "due to the clarity, rather than the ambiguity, of the *Garner* rule." *Clem*, 284 F.3d at 554. Manifestly, it is not justifiable to use deadly force against a retreating suspect accused of a non-violent crime, who does not present an immediate danger to the officers or to others and already has sustained multiple gunshot wounds at the hands of the police.[10] So, in sum, we hold that it was clearly established at the time Officer Painter shot Byers that Officer Painter's conduct as alleged in the complaint and as shown in the body camera video constituted an excessive use of force in violation of the Fourth Amendment.

## III.

For these reasons, after considering the totality of the circumstances from the facts alleged and the body camera video, we hold that the district court did not err in concluding

---

[10] We also observe that at the time of this encounter, Virginia recently had enacted Virginia Code § 19.2-83.5, which defines the circumstances under which an officer can use deadly force during an arrest or detention under Virginia law. The statute requires that (1) deadly force is "immediately necessary to protect" the officer or another; (2) the officer has provided a warning that he will use deadly force; (3) the officer's actions were reasonable under the totality of the circumstances; (4) "[a]ll other options have been exhausted." Va. Code § 19.2-83.5(A). Although this statute does not define the contour of the federal Fourth Amendment right, it confirms and codifies the same principles that this Court long has recognized, namely, that deadly force is justified only when the suspect poses an immediate threat to officers or to others. *See Cooper,* 735 F.3d at 159; *Knibbs,* 30 F.4th at 214. And officers in Virginia, like Officer Painter, necessarily are on notice of these statutory requirements.

24

that the plaintiffs sufficiently alleged a constitutional violation of the Fourth Amendment in Officer Painter's use of deadly force.  We further hold that the constitutional violation was clearly established at the time the incident occurred.  So, we affirm the district court's denial of Officer Painter's motion to dismiss asserting qualified immunity.

*AFFIRMED*

DIAZ, Chief Judge, dissenting:

Charles Byers's death was a tragedy. Today, I answer one narrow question about it—whether Officer Gordon Painter violated clearly established law when he shot and killed Byers.

The majority says yes. I can't agree. No case gave Painter notice that his actions violated clearly established law. So he's entitled to qualified immunity.

I.

A.

Byers suffered from schizoaffective disorder.[1] When his mental health worsened, his mother took him to a hospital for treatment. A state magistrate ordered his temporary detention at the hospital, as Virginia law permits. But for reasons unclear, he was later released on his own recognizance.

Byers then walked for miles over several hours to find his parents' home. He tried to enter a woman's house, and she called 911. The woman reported that Byers tried to break into her home (and several others) and that he then entered another neighbor's garage.

---

[1] According to the complaint, "[t]o receive a schizoaffective disorder diagnosis," one "must meet all the primary criteria for schizophrenia and have prominent mood disorder symptoms." Joint Appendix (J.A.) 46 ¶ 32. Byers's disorder "related to both schizophrenia and bipolar disorder." *Id.* Some typical symptoms of the disorder are agitation, grandiose delusions, and hallucinations.

Two officers responded to the 911 call. Their body-worn cameras captured what happened next.

B.

When the first officer[2] arrived, Byers was standing in a driveway, holding a hatchet he had taken from a garage. At least one bystander was nearby.

The officer drew her weapon and twice ordered Byers to drop the hatchet. Painter arrived, and Byers turned toward Painter's vehicle. The first officer again ordered Byers to drop the hatchet. Byers didn't respond. Instead, he walked from the driveway onto the front lawn and away from the officer.

Painter got out of his vehicle and drew his firearm. He too demanded that Byers drop the hatchet. Byers again didn't comply. This time, he walked from the yard onto the street, moving toward the officers, as they repeatedly ordered him to drop the hatchet. Byers's attention was fixed on Painter, who was about one car length from him.

Byers, now walking backward while facing the officers, then asked Painter: "You got a big ass handgun?" Joint Appendix (J.A.) 159 at 00:43-00:44. Painter responded, "Huh?" J.A. 159 at 00:44. Byers repeated: "You got a big enough gun?" J.A. 159 at 00:45-00:46. Painter responded: "Yeah, come on. Put it down." J.A. 159 at 00:47-00:49.

But Byers kept walking backward away from the officers, in the direction of an intersection. He ignored four more commands to drop the hatchet. The video evidence shows two cars moving through the intersection behind Byers.

---

[2] The record doesn't name this officer.

Painter told the first officer to tase Byers. She did, but Byers kept holding the hatchet and walking backward.

Painter then commanded Byers: "Put it, put it down. Come on." J.A. 159 at 01:07-01:08. Byers instead raised his right hand, slightly lifting the hatchet blade upward and in the direction of the officers before lowering it. Byers told the officers: "Come get it." J.A. 159 at 01:08-01:09. Painter ordered Byers once more to "[p]ut it down," J.A. 159 at 01:10–01:11, to which Byers again responded: "Come get it." J.A. 159 at 01:11.

As Byers turned his head to the right while holding the hatchet with the blade facing down, Painter fired his weapon.

Byers turned and began running toward the intersection. Within two seconds, Painter fired three more times. Moments later, Byers dropped the hatchet and fell. He'd been shot five times.

The officers handcuffed Byers. Painter then ran back to his vehicle. His body-worn camera showed that several bystanders had gathered behind the officers during the confrontation.

Byers died at the scene.

## II.

Law enforcement "officers are entitled to qualified immunity under [42 U.S.C.] § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (citation modified). "We may address these questions

28

in the order that would best facilitate the fair and efficient disposition of the case." *Atkinson v. Godfrey*, 100 F.4th 498, 504 (4th Cir. 2024). "That means that we may grant qualified immunity [solely] on the ground that the purported right was not clearly established[.]" *Id.*

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (citation modified). That is, "existing law must have placed the constitutionality of the officer's conduct beyond debate." *Id.* (citation modified). This "demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (citation modified).

The existing law "must clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* To that end, "courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 63–64 (citation modified). "A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established." *Id.* at 64 (citation modified).

"Specificity is especially important in the Fourth Amendment context" because "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (citation modified).

29

III.

The district court denied Painter qualified immunity. Relying on then-governing Fourth Circuit precedent, the court limited its analysis to the precise moment Painter shot Byers. It held that (1) because Byers made no furtive movement as Painter fired, no reasonable officer would think Byers posed an imminent threat, and (2) it was clearly established that Painter's conduct was unreasonable.

But since then, the Supreme Court has instructed courts to consider not only the exact moment officers use force but also the circumstances leading up to it. *See Barnes v. Felix*, 605 U.S. 73, 81–83 (2025) ("A court deciding a use-of-force case cannot review the totality of the circumstances if it has put on chronological blinders."). The majority claims to be faithful to *Barnes*, even while holding that the plaintiffs "plausibly alleged that Officer Painter's use of force was not 'objectively reasonable.'" Majority Op. at 17.

My friends acknowledge that the severity of Byers's crime weighs in favor of finding Painter's use of force reasonable. But they conclude that Byers didn't pose an immediate threat to the officers (or anyone else) and didn't resist arrest, which presumably weighs more heavily against Painter.

I needn't retread this part of the majority's analysis. I can decide this case by answering whether Painter's conduct violated clearly established law. *See Atkinson*, 100 F.4th at 504. It did not.

Relying on *Hensley ex rel. N.C. v. Price*, 876 F.3d 573 (4th Cir. 2017) and *Knibbs v. Momphard*, 30 F.4th 200 (4th Cir. 2022), the majority holds otherwise. They say that it was clearly established that an officer couldn't use deadly force against a suspect of a non-

30

violent crime "who possessed a deadly weapon" and "disregarded several commands to drop the weapon" but didn't make "any threatening or furtive movements." Majority Op. at 20.

That conclusion is wrong on the law and the facts.[3]

A.

Start with *Hensley*. There, law enforcement officers shot and killed a suspect, who held a handgun "pointed at the ground," without giving "any type of warning" or order "to stop, to drop the gun." 876 F.3d at 578. We held that "[t]he lawful possession of a firearm by a suspect at his home, without more, [can't] justify the use of deadly force," especially when the officers fail to warn. *Id.* at 583–84.

But that case wouldn't have given Painter notice that he couldn't fire on Byers. After all, Byers was holding a hatchet on another's property, after he purportedly attempted to break into and enter multiple houses. And the officers gave Byers no fewer than 15 commands to drop the hatchet.

So *Hensley* didn't "clearly prohibit [Painter's] conduct in the particular circumstances before him." *Wesby*, 583 U.S. at 63.

---

[3] The majority also says that Painter's conduct violated clearly established law because "the fact that Byers possessed a hatchet, which is less dangerous at 25 feet than a firearm, should have indicated to Officer Painter that Byers was *less* of a threat than the situations presented in *Hensley* and *Knibbs*." Majority Op. at 22. But we don't engage in a comparative danger analysis as part of our inquiry. Even so, a hatchet is a deadly weapon. *See Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 (4th Cir. 1998) (observing "studies which have shown that an assailant with an edged weapon within 21 feet of an armed police officer can kill the officer before the officer can get off a disabling shot").

31

B.

Next, consider *Knibbs*. A sheriff's deputy shot and killed Knibbs through the window of his home, after the deputy heard Knibbs load a shotgun and Knibbs didn't respond to two orders to "drop it." 30 F.4th at 207–10.

We held that "failure to obey commands by a person in possession of . . . a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon." *Id.* at 225. But we also said that an officer need not "wait until a gun is pointed at him before he is entitled to use deadly force when other factors (like furtive movement) indicate an imminent threat to life." *Id.* at 222.

Here, Byers didn't just fail to respond to repeated commands to drop the hatchet. He twice made comments about Painter's gun. And he twice challenged the officers to take the hatchet.

Contrast that with *Knibbs*, where the decedent never mentioned the officer's firearm, challenged the officer to take his shotgun, or verbally opposed commands to drop the weapon. So that case didn't establish—much less clearly so—that an officer can't use deadly force when confronted with someone holding a dangerous weapon at close range who confronts the officer, challenges him to take the weapon, and disobeys repeated commands to drop it.

The majority glosses over most of this, leading it to inaccurately frame the threshold question. To be fair, my colleagues don't ignore altogether Byers's confrontational statements. Relying on *Knibbs*, they say that the statements "did not precede, coincide with, or follow any threatening or furtive movement with the hatchet" and are thus

32

immaterial. Majority Op. at 21–22. Absent a furtive movement, they conclude, "our precedent clearly established that it was unreasonable for Officer Painter to use deadly force against Byers." Majority Op. at 21.

But that reading of *Knibbs* is too narrow. We didn't hold there that officers can't use deadly force unless a suspect makes a furtive movement. Rather, we observed that furtive movement is but one indicator of an imminent threat. *See Knibbs*, 30 F.4th at 222. Here, Byers challenged the officers to take the hatchet, giving them reason to believe that he wouldn't surrender it and that he sought confrontation. *See, e.g.*, *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 785, 787 (4th Cir. 1998) (granting qualified immunity to officer who used deadly force in part because suspect's threats, including challenge to officers to "come in and get me," created "volatile and threatening" situation).

Nor does the majority account fully for the threat that Byers posed to bystanders. It incorrectly concludes that "the only bystander visible before the shooting appears to be *behind* the officers and not close enough to be considered in immediate danger." Majority Op. at 14–15.

But that view sidesteps the potential threat to the bystanders driving through the intersection. The majority says that the intersection "was not part of the general area in which the shooting occurred." Majority Op. at 15 n.6. But the video evidence shows that Byers was mere feet from it when he fell. And the majority's insistence that any bystander[4]

---

[4] The majority questions whether there was more than one bystander behind the officers during the encounter. The video evidence shows several people behind the officers immediately after the shooting, so they must have gathered during the confrontation. But (Continued)

33

behind the officers wouldn't be in danger relies on "the 20/20 vision of hindsight" our precedent forecloses. *Rambert v. City of Greenville*, 107 F.4th 388, 397 (4th Cir. 2024) (citation modified). Faced with an armed suspect challenging him to take the weapon, Painter may well have assessed (even if mistakenly) that a bystander was at serious and imminent risk.

C.

In any event, the video evidence shows that Byers made a furtive movement with the hatchet. Just three to four seconds before he was shot, Byers slightly lifted his hand, moving the hatchet blade upward and toward the officers immediately before telling them to "come get it." J.A. 159 at 01:07-01:10.

The majority says we can't consider this portion of the video because we "must credit the plaintiffs' version of the facts to the extent that they are not 'blatantly contradicted' by the video recording." *See* Majority Op. at 15 (quoting *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024)). But the majority insists that "[t]his difficult standard has not been met[,]" without comparing what the plaintiffs alleged with all the video shows. *Id.*

The plaintiffs made the sweeping and unspecific allegation that Byers "was not a threat to Officer Painter or anyone else." J.A. 62 ¶ 53. Yet the majority incorrectly compares this broad allegation with only one narrow aspect of the video. It says that the video doesn't blatantly contradict the plaintiffs' allegations that Byers wasn't a threat

---

this distinction isn't material to our analysis because Painter may have assessed that at least one bystander behind him was at serious and imminent risk.

34

because "[a]t most, [the video] shows that Byers tilted the [hatchet] blade slightly upward." Majority Op. at 19.

But the video depicts much more. It shows that Byers slightly raised the hatchet so that the blade faced the officers, while daring them twice to take the weapon from him, and after ignoring repeated commands to drop it. That evidence, coupled with the obvious fact that Byers could have thrown the hatchet at any moment, "clearly depicts a set of facts contrary to those alleged in the complaint" that he posed no threat at all. *Doriety*, 109 F.4th at 679 (citation modified).

We can and should consider this evidence. *See Scott v. Harris*, 550 U.S. 372, 380–81 (instructing appeals courts to "view[] the facts in the light depicted by the videotape" when such evidence "utterly discredit[s]" plaintiffs' "version of the events" that is "visible fiction"). And given that evidence, it's wrong for the majority to maintain that "Byers kept the hatchet lowered at his waist throughout the encounter and never made any movement suggesting that he intended to use the hatchet or to throw it at the officers." Majority Op. at 7, 13.

Respectfully, my colleagues are splitting the thinnest of evidentiary hairs. Worse, they're quick to ascribe benign intent to an axe-wielding man on a public street who ignores over a dozen commands to drop his weapon, and instead challenges officers to take it.

That magnanimous view is easy for judges to draw in the calm and comfort of chambers. But "officers on the beat are not often afforded the luxury of armchair reflection." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996). An officer in a tense

35

situation like Painter faced may well have perceived even a slight movement of a dangerous weapon as an imminent threat.

The majority holds that Painter went too far. But no case would have put him on notice of the rule announced today.

* * *

In sum, we've never held that an officer can't use deadly force when confronted by someone who (1) is holding a dangerous weapon at close range, (2) disobeys more than a dozen clear commands to drop the weapon, (3) moves toward passing bystanders, (4) lifts the weapon (even slightly) so that its blade is facing the officer, and (5) challenges the officer to take the weapon.

Because it wasn't clearly established that Painter's conduct was unlawful, he's entitled to qualified immunity.

## IV.

Writing this dissent pains me. No matter what we say today, a man in mental distress died at the hands of someone sworn to protect him. I wish it were otherwise.

Although small solace for the Byers family, I'm heartened that more police departments are training officers to recognize the signs of mental illness and to use de-escalation techniques when feasible. *See, e.g.*, *Aleman v. City of Charlotte*, 80 F.4th 264, 279, 281 (4th Cir. 2023) (observing evidence that "City had trained the officers on relevant policies concerning the use of force and interacting with . . . persons suffering from mental illness," including effective de-escalation communication); *Johnson v. City of Phila.*, 837

36

F.3d 343, 350 (3d Cir. 2016) (noting city directive instructing police officers who encounter mentally distressed suspects "to wait for back-up" and "to attempt to de-escalate the situation through conversation").

But what is sound policy and better policing isn't our call to make.

I respectfully dissent.